## McGAUTHA v. CALIFORNIA

No. 203.   Argued November 9, 1970—Decided May 3, 1971*

*Together with No. 204, *Crampton* v. *Ohio,* on certiorari to the Supreme Court of Ohio.

HARLAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. BLACK, J., filed a separate opinion, *post*, p. 225. DOUGLAS, J., filed an opinion dissenting in No. 204, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 226. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 248.

*Herman F. Selvin*, by appointment of the Court, 400 U. S. 885, argued the cause and filed briefs for petitioner in No. 203. *John J. Callahan*, by appointment of the Court, 399 U. S. 924, argued the cause for petitioner in No. 204. With him on the brief were *Dan H. McCullough, William T. Burgess, William D. Driscoll*, and *Gerald S. Lubitsky.*

*Ronald M. George*, Deputy Attorney General of California, argued the cause for respondent in No. 203. With him on the brief were *Thomas C. Lynch*, Attorney General, and *William E. James*, Assistant Attorney General. *Melvin L. Resnick* argued the cause for respondent in No. 204. With him on the brief were *Harry Friberg* and *Alice L. Robie Resnick.*

*Solicitor General Griswold* argued the cause for the United States as *amicus curiae* urging affirmance in both cases. With him on the brief was *Philip A. Lacovara.*

*Jack Greenberg, James M. Nabrit III, Michael Meltsner*, and *Anthony G. Amsterdam* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., et al. as *amici curiae* in both cases. *Luke McKissack* filed a brief as *amicus curiae* in No. 203. Briefs of *amici curiae* in No. 204 were filed by *Richard F. Stevens* for the Attor-

ney General of Ohio; by *Elmer Gertz* and *Willard J. Lassers* for the American Civil Liberties Union, Illinois Division, et al.; and by *Messrs. Lassers, Gertz, Alex Elson,* and *Marvin Braiterman* for the American Friends Service Committee et al.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioners McGautha and Crampton were convicted of murder in the first degree in the courts of California and Ohio respectively and sentenced to death pursuant to the statutes of those States. In each case the decision whether the defendant should live or die was left to the absolute discretion of the jury. In McGautha's case the jury, in accordance with California law, determined punishment in a separate proceeding following the trial on the issue of guilt. In Crampton's case, in accordance with Ohio law, the jury determined guilt and punishment after a single trial and in a single verdict. We granted certiorari in the *McGautha* case limited to the question whether petitioner's constitutional rights were infringed by permitting the jury to impose the death penalty without any governing standards. 398 U. S. 936 (1970). We granted certiorari in the *Crampton* case limited to that same question and to the further question whether the jury's imposition of the death sentence in the same proceeding and verdict as determined the issue of guilt was constitutionally permissible. *Ibid.*[1] For the reasons

---

[1] The same two questions were included in our grant of certiorari in *Maxwell* v. *Bishop,* 393 U. S. 997 (1968), two Terms ago. After twice hearing argument in that case, see 395 U. S. 918 (1969), we remanded the case to the District Court for consideration of possible violations of the rule of *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968). 398 U. S. 262 (1970). In taking that course we at the same time granted certiorari in the *McGautha* and *Crampton* cases to consider the two questions thus pretermitted in *Maxwell.* See *id.,* at 267 n. 4.

that follow, we find no constitutional infirmity in the conviction of either petitioner, and we affirm in both cases.

## I

It will put the constitutional issues in clearer focus to begin by setting out the course which each trial took.

### A. McGautha's Guilt Trial

McGautha and his codefendant Wilkinson were charged with committing two armed robberies and a murder on February 14, 1967.[2] In accordance with California procedure in capital cases, the trial was in two stages, a guilt stage and a punishment stage.[3] At the guilt trial the

---

[2] The information also alleged that McGautha had four prior felony convictions: felonious theft, robbery, murder without malice, and robbery by assault. The most recent of these convictions occurred in 1952. In a proceeding in chambers McGautha admitted the convictions, and the jury did not learn of them at the guilt stage of the trial.

[3] Cal. Penal Code § 190.1 (1970) provides:

"The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, and has been found sane on any plea of not guilty by reason of insanity, there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented, and the penalty fixed shall be expressly stated in the decision or verdict. The death penalty shall not be imposed, however, upon any person who was under the age of 18 years at the time of the commission of the crime. The burden of proof as to the age of said person shall be upon the defendant.

"If the defendant was convicted by the court sitting without a jury, the trier of fact shall be the court. If the defendant was

evidence tended to show that the defendants, armed with pistols, entered the market of Mrs. Pon Lock early in the afternoon of the murder. While Wilkinson kept a customer under guard, McGautha trained his gun on Mrs. Lock and took almost $300. Roughly three hours later, McGautha and Wilkinson held up another store, this one owned by Mrs. Benjamin Smetana and operated by her with her husband's assistance. While one defendant forcibly restrained a customer, the other struck Mrs. Smetana on the head. A shot was fired, fatally wounding Mr. Smetana. Wilkinson's former girl friend testified that shortly after the robbery McGautha told her he had shot a man and showed her an empty cartridge in the cylinder of his gun. Other evidence at the guilt stage was inconclusive on the issue as to who fired the fatal shot. The jury found both defendants guilty of two counts of armed robbery and one count of first-degree murder as charged.

## B. McGautha's Penalty Trial

At the penalty trial, which took place on the following day but before the same jury, the State waived its opening, presented evidence of McGautha's prior felony convictions and sentences, see n. 2, *supra,* and then rested. Wilkinson testified in his own behalf, relating his unhappy childhood in Mississippi as the son of a white

---

convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived. If the defendant was convicted by a jury, the trier of fact shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty.

"In any case in which defendant has been found guilty by a jury, and the same or another jury, trying the issue of penalty, is unable to reach a unanimous verdict on the issue of penalty, the court shall dismiss the jury and either impose the punishment for life in lieu of ordering a new trial on the issue of penalty, or order a new jury impaneled to try the issue of penalty, but the issue of guilt shall not be retried by such jury."

father and a Negro mother, his honorable discharge from
the Army on the score of his low intelligence, his regular
attendance at church, and his good record for holding jobs
and supporting his mother and siblings up to the time he
was shot in the back in an unprovoked assault by a street
gang. Thereafter, he testified, he had difficulty obtaining or holding employment. About a year later he fell
in with McGautha and his companions, and when they
found themselves short of funds, one of the group suggested that they "knock over somebody." This was the
first time, Wilkinson said, that he had ever had any
thoughts of committing a robbery. He admitted participating in the two robberies but said he had not known
that the stores were to be held up until McGautha drew
his gun. He testified that it had been McGautha who
struck Mrs. Smetana and shot Mr. Smetana.

Wilkinson called several witnesses in his behalf. An
undercover narcotics agent testified that he had seen
the murder weapon in McGautha's possession and had
seen McGautha demonstrating his quick draw. A minister with whom Wilkinson had boarded testified to
Wilkinson's church attendance and good reputation. He
also stated that before trial Wilkinson had expressed his
horror at what had happened and requested the minister's
prayers on his behalf. A former fellow employee testified
that Wilkinson had a good reputation and was honest
and peaceable.

McGautha also testified in his own behalf at the penalty hearing. He admitted that the murder weapon was
his, but testified that he and Wilkinson had traded guns,
and that it was Wilkinson who had struck Mrs. Smetana
and killed her husband. McGautha testified that he
came from a broken home and that he had been wounded
during World War II. He related his employment record, medical condition, and remorse. He admitted his
criminal record, see n. 2, *supra,* but testified that he had

been a mere accomplice in two of those robberies and that his prior conviction for murder had resulted from a slaying in self-defense. McGautha also admitted to a 1964 guilty plea to a charge of carrying a concealed weapon. He called no witnesses in his behalf.

The jury was instructed in the following language:

"in this part of the trial the law does not forbid you from being influenced by pity for the defendants and you may be governed by mere sentiment and sympathy for the defendants in arriving at a proper penalty in this case; however, the law does forbid you from being governed by mere conjecture, prejudice, public opinion or public feeling.

"The defendants in this case have been found guilty of the offense of murder in the first degree, and it is now your duty to determine which of the penalties provided by law should be imposed on each defendant for that offense. Now, in arriving at this determination you should consider all of the evidence received here in court presented by the People and defendants throughout the trial before this jury. You may also consider all of the evidence of the circumstances surrounding the crime, of each defendant's background and history, and of the facts in aggravation or mitigation of the penalty which have been received here in court. However, it is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other hand.

.    .    .    .    .

". . . Notwithstanding facts, if any, proved in mitigation or aggravation, in determining which punishment shall be inflicted, you are entirely free to act according to your own judgment, conscience,

and absolute discretion. That verdict must express the individual opinion of each juror.

"Now, beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience, and absolute discretion of the jury. In the determination of that matter, if the jury does agree, it must be unanimous as to which of the two penalties is imposed." App. 221–223.[4]

---

[4] The penalty jury interrupted its deliberations to ask whether a sentence of life imprisonment meant that there was no possibility of parole. The trial judge responded as follows:

"A sentence of life imprisonment means that the prisoner may be paroled at some time during his lifetime or that he may spend the remainder of his natural life in prison. An agency known as the Adult Authority is empowered by statute to determine if and when a prisoner is to be paroled, and under the statute no prisoner can be paroled unless the Adult Authority is of the opinion that the prisoner when released will assume a proper place in society and that his release is not contrary to the welfare of society. A prisoner released on parole may remain on parole for the balance of his life and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

"So that you will have no misunderstandings relating to a sentence of life imprisonment, you have been informed as to the general scheme of our parole system. You are now instructed, however, that the matter of parole is not to be considered by you in determining the punishment for either defendant, and you may not speculate as to if, or when, parole would or would not be granted. It is not your function to decide now whether these men will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether these men shall suffer the death penalty or whether they shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment is the proper sentence, you must assume that those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that they will not parole a defendant unless he can be safely released into society. It

Deliberations began in the early afternoon of August 24, 1967. In response to jury requests the testimony of Mrs. Smetana and of three other witnesses was reread. Late in the afternoon of August 25 the jury returned verdicts fixing Wilkinson's punishment at life imprisonment and McGautha's punishment at death.

The trial judge ordered a probation report on McGautha. Having received it, he overruled McGautha's motions for a new trial or for a modification of the penalty verdict, and pronounced the death sentence.[5] McGautha's conviction was unanimously affirmed by the California Supreme Court. 70 Cal. 2d 770, 452 P. 2d 650 (1969). His contention that standardless jury sentencing is unconstitutional was rejected on the authority of an earlier case, *In re Anderson,* 69 Cal. 2d 613, 447 P. 2d 117 (1968), in which that court had divided narrowly on the issue.

## C. Crampton's Trial

Petitioner Crampton was indicted for the murder of his wife, Wilma Jean, purposely and with premeditated malice. He pleaded not guilty and not guilty by reason of insanity.[6] In accordance with the Ohio practice which

would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Adult Authority will properly carry out its responsibilities." App. 224–225.

[5] Under California law the trial judge has power to reduce the penalty to life if he concludes that the jury's verdict is not supported by the weight of the evidence. Cal. Penal Code § 1181 (7). See *In re Anderson,* 69 Cal. 2d 613, 623, 447 P. 2d 117, 124 (1968). The California Supreme Court, to which appeal is automatic in capital cases, Cal. Penal Code § 1239 (b), has no such power. *People* v. *Lookadoo,* 66 Cal. 2d 307, 327, 425 P. 2d 208, 221 (1967).

[6] Pursuant to Ohio law, Ohio Rev. Code Ann. § 2945.40 (1954), Crampton was committed to a state mental hospital for a month of observation. After a hearing on the psychiatric report the trial court determined that Crampton was competent to stand trial.

he challenges, his guilt and punishment were determined in a single unitary proceeding.

At trial the State's case was as follows. The Cramptons had been married about four months at the time of the murder. Two months before the slaying Crampton was allowed to leave the state mental hospital, where he was undergoing observation and treatment for alcoholism and drug addiction, to attend the funeral of his wife's father. On this occasion he stole a knife from the house of his late father-in-law and ran away. He called the house several times and talked to his wife, greatly upsetting her. When she pleaded with him to return to the hospital and stated that she would have to call the police, he threatened to kill her if she did. Wilma and her brother nevertheless did notify the authorities, who picked Crampton up later the same evening. There was testimony of other threats Crampton had made on his wife's life, and it was revealed that about 10 days before the murder Mrs. Crampton's fear of her husband had caused her to request and receive police protection.

The State's main witness to the facts surrounding the murder was one William Collins, a convicted felon who had first met Crampton when they, along with Crampton's brother Jack, were in the State Prison in Michigan. On January 14, 1967, three days before the murder, Collins and Crampton met at Jack Crampton's house in Pontiac, Michigan. During those three days Collins and Crampton roamed the upper Midwest, committing a series of petty thefts and obtaining amphetamines, to which both were addicted, by theft and forged prescriptions.

About nine o'clock on the evening of January 16, Crampton called his wife from St. Joseph, Michigan; after the call he told Collins that he had to get back to Toledo, where his wife was, as fast as possible. They arrived in the early morning hours of January 17. After

Crampton had stopped by his wife's home and sent Collins to the door with a purported message for her, the two went to the home of Crampton's mother-in-law, which Crampton knew to be empty, to obtain some guns. They broke in and stole a rifle, ammunition, and some handguns, including the .45 automatic which was later identified as the murder weapon. Crampton kept this gun with him. He indicated to Collins that he believed his wife was having an affair. He fired the .45 in the air, with a remark to the effect that "a slug of that type would do quite a bit of damage," and said that if he found his wife with the man he suspected he would kill them both.

That evening Crampton called his wife's home and learned that she was present. He quickly drove out to the house, and told Collins, "Leave me off right here in front of the house and you take the car and go back to the parking lot and if I'm not there by six o'clock in the morning you're on your own."

About 11:20 that evening Crampton was arrested for driving a stolen car. The murder weapon was found between the seats of the car.

Mrs. Crampton's body was found the next morning. She had been shot in the face at close range while she was using the toilet. A .45-caliber shell casing was near the body. A jacket which Crampton had stolen a few days earlier was found in the living room. The coroner, who examined the body at 11:30 p. m. on January 18, testified that in his opinion death had occurred 24 hours earlier, plus or minus four hours.

The defense called Crampton's mother as a witness. She testified about Crampton's background, including a serious concussion received at age nine, his good grades in junior high school, his stepfather's jealousy of him, his leaving home at age 14 to live with various relatives, his enlistment in the Navy at age 17, his marriage to a girl named Sandra, the birth of a son, a divorce, then a

remarriage to Sandra and another divorce shortly after, and finally his marriage to Wilma. Mrs. Crampton also testified to Crampton's drug addiction, to his brushes with the law as a youth and as an adult, and to his undesirable discharge from the Navy.

Crampton's attorney also introduced into evidence a series of hospital reports which contained further information on Crampton's background, including his criminal record, which was substantial, his court-martial conviction and undesirable discharge from the Navy, and the absence of any significant employment record. They also contained his claim that the shooting was accidental; that he had been gathering up guns around the house and had just removed the clip from an automatic when his wife asked to see it; that as he handed it to her it went off accidentally and killed her. All the reports concluded that Crampton was sane in both the legal and the medical senses. He was diagnosed as having a sociopathic personality disorder, along with alcohol and drug addiction. Crampton himself did not testify.

The jury was instructed that:

> "If you find the defendant guilty of murder in the first degree, the punishment is death, unless you recommend mercy, in which event the punishment is imprisonment in the penitentiary during life." App. 70.

The jury was given no other instructions specifically addressed to the decision whether to recommend mercy, but was told in connection with its verdict generally:

> "You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the court to your findings and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict.

"Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy, or prejudice, so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried." App. 71–72.

The jury deliberated for over four hours and returned a verdict of guilty, with no recommendation for mercy.

Sentence was imposed about two weeks later. As Ohio law requires, Ohio Rev. Code Ann. § 2947.05 (1954), Crampton was informed of the verdict and asked whether he had anything to say as to why judgment should not be pronounced against him. He replied:

"Please the Court, I don't believe I received a fair and impartial trial because the jury was prejudiced by my past record and the fact I had been a drug addict, and I just believe I didn't receive a fair and impartial trial. That's all I have to say."

This statement was found insufficient to justify not pronouncing sentence upon him, and the court imposed the death sentence.[7] Crampton's appeals through the Ohio courts were unavailing. 18 Ohio St. 2d 182, 248 N. E. 2d 614 (1969).

## II

Before proceeding to a consideration of the issues before us, it is important to recognize and underscore the nature of our responsibilities in judging them. Our function is not to impose on the States, *ex cathedra,* what might seem to us a better system for dealing with capital cases. Rather, it is to decide whether the Federal Constitution proscribes the present procedures of these two

---

[7] Under Ohio law, a jury's death verdict may not be reduced as excessive by either the trial or the appellate court. *Turner* v. *State,* 21 Ohio Law Abs. 276, 279–280 (Ct. App. 1936); *State* v. *Klumpp,* 15 Ohio Op. 2d 461, 468, 175 N. E. 2d 767, 775–776 (Ct. App.), appeal dismissed, 171 Ohio St. 62, 167 N. E. 2d 778 (1960).

States in such cases. In assessing the validity of the conclusions reached in this opinion, that basic factor should be kept constantly in mind.

## III

We consider first McGautha's and Crampton's common claim: that the absence of standards to guide the jury's discretion on the punishment issue is constitutionally intolerable. To fit their arguments within a constitutional frame of reference petitioners contend that to leave the jury completely at large to impose or withhold the death penalty as it sees fit is fundamentally lawless and therefore violates the basic command of the Fourteenth Amendment that no State shall deprive a person of his life without due process of law. Despite the undeniable surface appeal of the proposition, we conclude that the courts below correctly rejected it.[8]

---

[8] The lower courts thus placed themselves in accord with all other American jurisdictions which have considered the issue. See, e. g., In re Ernst, 294 F. 2d 556 (CA3 1961); Florida ex rel. Thomas v. Culver, 253 F. 2d 507 (CA5 1958); Maxwell v. Bishop, 398 F. 2d 138 (CA8 1968), vacated on other grounds, 398 U. S. 262 (1970); Sims v. Eyman, 405 F. 2d 439 (CA9 1969); Segura v. Patterson, 402 F. 2d 249 (CA10 1968); McCants v. State, 282 Ala. 397, 211 So. 2d 877 (1968); Bagley v. State, 247 Ark. 113, 444 S. W. 2d 567 (1969); State v. Walters, 145 Conn. 60, 138 A. 2d 786, appeal dismissed, 358 U. S. 46 (1958); Wilson v. State, 225 So. 2d 321 (Fla. 1969); Miller v. State, 224 Ga. 627, 163 S. E. 2d 730 (1968); State v. Latham, 190 Kan. 411, 375 P. 2d 788 (1962); Duisen v. State, 441 S. W. 2d 688 (Mo. 1969); State v. Johnson, 34 N. J. 212, 168 A. 2d 1, appeal dismissed, 368 U. S. 145 (1961); People v. Fitzpatrick, 61 Misc. 2d 1043, 308 N. Y. S. 2d 18 (1970); State v. Roseboro, 276 N. C. 185, 171 S. E. 2d 886 (1970); Hunter v. State, 222 Tenn. 672, 440 S. W. 2d 1 (1969); State v. Kelbach, 23 Utah 2d 231, 461 P. 2d 297 (1969); Johnson v. Commonwealth, 208 Va. 481, 158 S. E. 2d 725 (1968); State v. Smith, 74 Wash. 2d 744, 446 P. 2d 571 (1968).

## A

In order to see petitioners' claim in perspective, it is useful to call to mind the salient features of the history of capital punishment for homicides under the common law in England, and subsequent statutory developments in this country. This history reveals continual efforts, uniformly unsuccessful, to identify before the fact those homicides for which the slayer should die. Thus, the laws of Alfred, echoing Exodus 21: 12–13, provided: "Let the man who slayeth another wilfully perish by death. Let him who slayeth another of necessity or unwillingly, or unwilfully, as God may have sent him into his hands, and for whom he has not lain in wait be worthy of his life and of lawful bot if he seek an asylum." Quoted in 3 J. Stephen, History of the Criminal Law of England 24 (1883). In the 13th century, Bracton set it down that a man was responsible for all homicides except those which happened by pure accident or inevitable necessity, although he did not explain the consequences of such responsibility. *Id.*, at 35. The Statute of Gloucester, 6 Edw. 1, c. 9 (1278), provided that in cases of self-defense or misadventure the jury should neither convict nor acquit, but should find the fact specially, so that the King could decide whether to pardon the accused. It appears that in time such pardons—which may not have prevented forfeiture of goods—came to issue as of course. 3 Stephen, *supra,* at 36–42.

During all this time there was no clear distinction in terminology or consequences among the various kinds of criminal homicide. All were *prima facie* capital, but all were subject to the benefit of clergy, which after 1350 came to be available to almost any man who could read. Although originally those entitled to benefit of clergy were simply delivered to the bishop for ecclesiastical proceedings, with the possibility of degradation from orders,

incarceration, and corporal punishment for those found guilty, during the 15th and 16th centuries the maximum penalty for clergyable offenses became branding on the thumb, imprisonment for not more than one year, and forfeiture of goods. 1 Stephen, *supra,* at 459–464. By the statutes of 23 Hen. 8, c. 1, §§ 3, 4 (1531), and 1 Edw. 6, c. 12, § 10 (1547), benefit of clergy was taken away in all cases of "murder of malice prepensed." 1 Stephen, *supra,* at 464–465; 3 *id.,* at 44. During the next century and a half, however, "malice prepense" or "malice aforethought" came to be divorced from actual ill will and inferred without more from the act of killing. Correspondingly, manslaughter, which was initially restricted to cases of "chance medley," came to include homicides where the existence of adequate provocation rebutted the inference of malice. 3 *id.,* at 46–73.

The growth of the law continued in this country, where there was rebellion against the common-law rule imposing a mandatory death sentence on all convicted murderers. Thus, in 1794, Pennsylvania attempted to reduce the rigors of the law by abolishing capital punishment except for "murder of the first degree," defined to include all "willful, deliberate and premeditated" killings, for which the death penalty remained mandatory. Pa. Laws 1794, c. 1777. This reform was soon copied by Virginia and thereafter by many other States.

This new legislative criterion for isolating crimes appropriately punishable by death soon proved as unsuccessful as the concept of "malice aforethought." Within a year the distinction between the degrees of murder was practically obliterated in Pennsylvania. See Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U. Pa. L. Rev. 759, 773–777 (1949). Other States had similar experiences. Wechsler & Michael, A Rationale of the Law of Homicide: I, 37 Col. L. Rev. 701,

707–709 (1937). The result was characterized in this way by Chief Judge Cardozo, as he then was:

"What we have is merely a privilege offered to the jury to find the lesser degree when the suddenness of the intent, the vehemence of the passion, seems to call irresistibly for the exercise of mercy. I have no objection to giving them this dispensing power, but it should be given to them directly and not in a mystifying cloud of words." What Medicine Can Do For Law, in Law and Literature 70, 100 (1931).[9]

At the same time, jurors on occasion took the law into their own hands in cases which were "willful, deliberate, and premeditated" in any view of that phrase, but which nevertheless were clearly inappropriate for the death penalty. In such cases they simply refused to convict of the capital offense. See Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶¶ 27–29 (1953); *Andres* v. *United States,* 333 U. S. 740, 753 (1948) (Frankfurter, J., concurring); cf. H. Kalven & H. Zeisel, The American Jury 306–312 (1966).

In order to meet the problem of jury nullification, legislatures did not try, as before, to refine further the definition of capital homicides. Instead they adopted the method of forthrightly granting juries the discretion which they had been exercising in fact. See Knowlton, Problems of Jury Discretion in Capital Cases, 101 U. Pa. L. Rev. 1099, 1102 and n. 18 (1953); Note, The Two-Trial System in Capital Cases, 39 N. Y. U. L. Rev. 50,

---

[9] In context the emphasis is on the confusing distinction between degrees of murder, not the desirability of juries' sentencing discretion. It may also be noted that the former New York definitions of first- and second-degree murder were somewhat unusual. See Wechsler & Michael, 37 Col. L. Rev., at 704 n. 13, 709 n. 26.

52 (1964). Tennessee was the first State to give juries sentencing discretion in capital cases,[10] Tenn. Laws 1837–1838, c. 29, but other States followed suit, as did the Federal Government in 1897.[11] Act of Jan. 15, 1897, c. 29, § 1, 29 Stat. 487. Shortly thereafter, in *Winston* v. *United States,* 172 U. S. 303 (1899), this Court dealt with the federal statute for the first time.[12] The Court reversed a murder conviction in which the trial judge instructed the jury that it should not return a recommendation of mercy unless it found the existence of mitigating circumstances. The Court found this instruction to interfere with the scheme of the Act to commit the whole question of capital punishment "to the judgment and the consciences of the jury." *Id.,* at 313.

> "How far considerations of age, sex, ignorance, illness or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocable-

---

[10] The practice of jury sentencing arose in this country during the colonial period for cases not involving capital punishment. It has been suggested that this was a "reaction to harsh penalties imposed by judges appointed and controlled by the Crown" and a result of "the early distrust of governmental power." President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 26 (1967).

[11] California and Ohio, the two States involved in these cases, abolished mandatory death penalties in favor of jury discretion in 1874 and 1898. Act of Mar. 28, 1874, c. 508, Cal. Amendatory Acts 1873–1874, p. 457; Ohio Laws 1898, p. 223. Except for four States that entirely abolished capital punishment in the middle of the last century, every American jurisdiction has at some time authorized jury sentencing in capital cases. None of these statutes have provided standards for the choice between death and life imprisonment. See Brief for the United States as Amicus Curiae 128–137.

[12] See also *Calton* v. *Utah,* 130 U. S. 83 (1889), in which the Court reversed a conviction under the statutes of Utah Territory in which the jury had not been informed of its right under the territorial code to recommend a sentence of imprisonment for life at hard labor instead of death.

ness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone." *Ibid.*

This Court subsequently had occasion to pass on the correctness of instructions to the jury with respect to recommendations of mercy in *Andres* v. *United States,* 333 U. S. 740 (1948). The Court approved, as consistent with the governing statute, an instruction that:

"This power [to recommend mercy] is conferred solely upon you and in this connection the Court can not extend or prescribe to you any definite rule defining the exercise of this power, but commits the entire matter of its exercise to your judgment." *Id.,* at 743 n. 4.

The case was reversed, however, on the ground that other instructions on the power to recommend mercy might have been interpreted by the jury as requiring them to return an unqualified verdict of guilty unless they unanimously agreed that mercy should be extended. The Court determined that the proper construction was to require a unanimous decision to withhold mercy as well, on the ground among others that the latter construction was "more consonant with the general humanitarian purpose of the statute." *Id.,* at 749. The only other significant discussion of standardless jury sentencing in capital cases in our decisions is found in *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968). In reaching its conclusion that persons with conscientious scruples against the death penalty could not be automatically excluded from sentencing juries in capital cases, the Court relied heavily

on the fact that such juries "do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Id.,* at 519 (footnote omitted). The Court noted that "one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' " *Id.,* at 519 n. 15. The inner quotation is from the opinion of Mr. Chief Justice Warren for four members of the Court in *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958).

In recent years academic and professional sources have suggested that jury sentencing discretion should be controlled by standards of some sort. The American Law Institute first published such a recommendation in 1959.[13] Several States have enacted new criminal codes

---

[13] Model Penal Code § 201.6 (Tent. Draft No. 9, 1959). The criteria were revised and approved by the Institute in 1962 and now appear in § 210.6 of the Proposed Official Draft of the Model Penal Code. As revised they appear in the Appendix to this opinion. More recently the National Commission on Reform of Federal Criminal Laws published a Study Draft of a New Federal Criminal Code (1970). Section 3605 contained standards virtually identical to those of the Model Penal Code. The statement of the Chairman of the Commission, submitting the Study Draft for public comment, described it as "something more than a staff report and less than a commitment by the Commission or any of its members to every aspect of the Draft." Study Draft xx. The primary differences between the procedural provisions for capital sentencing in the Model Penal Code and those in the Study Draft are that the Code provides that the court and jury "shall" take the criteria into account, while the Study Draft provided that they "may" do so; and the Model Penal Code forbids imposition of the death penalty where no aggravating circumstances are found, while the Study Draft showed this only as an alternative provision. The latter feature is affected by the fact that only a very few murders were

in the intervening 12 years, some adopting features of
the Model Penal Code.[14]   Other States have modified
their laws with respect to murder and the death penalty
in other ways.[15]   None of these States have followed the
Model Penal Code and adopted statutory criteria for
imposition of the death penalty.   In recent years, chal-
lenges to standardless jury sentencing have been pre-
sented to many state and federal appellate courts.   No
court has held the challenge good.   See n. 8, *supra*.   As
petitioners recognize, it requires a strong showing to upset
this settled practice of the Nation on constitutional
grounds.   See *Walz* v. *Tax Commission*, 397 U. S. 664,
678 (1970); *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31
(1922); cf. *Palko* v. *Connecticut*, 302 U. S. 319, 325
(1937).

## B

Petitioners seek to avoid the impact of this history by
the observation that jury sentencing discretion in capital
cases was introduced as a mechanism for dispensing
mercy—a means for dealing with the rare case in which
the death penalty was thought to be unjustified.   Now,
they assert, the death penalty is imposed on far fewer than
half the defendants found guilty of capital crimes.   The
state and federal legislatures which provide for jury dis-
cretion in capital sentencing have, it is said, implicitly

---

to be made capital. See *id.*, at 307. In its Final Report (1971), the
Commission recommended abolition of the death penalty for federal
crimes. An alternate version, said to represent a "substantial body
of opinion in the Commission," *id.*, comment to provisional § 3601,
provided for retention of capital punishment for murder and treason
with procedural provisions which did not significantly differ from
those in the Study Draft.

[14] See, *e. g.*, N. Y. Penal Law § 65.00 (1967) (criteria for judges
in deciding on probation).

[15] *E. g.*, N. M. Stat. Ann. §§ 40A–29–2.1, 40A–29–2.2 (Supp.
1969), reducing the class of capital crimes.

determined that some—indeed, the greater portion—of those guilty of capital crimes should be permitted to live. But having made that determination, petitioners argue, they have stopped short—the legislatures have not only failed to provide a rational basis for distinguishing the one group from the other, cf. *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942), but they have failed even to suggest any basis at all. Whatever the merits of providing such a mechanism to take account of the unforeseeable case calling for mercy, as was the original purpose, petitioners contend the mechanism is constitutionally intolerable as a means of selecting the extraordinary cases calling for the death penalty, which is its present-day function.

In our view, such force as this argument has derives largely from its generality. Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by the history recounted above. To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

Thus the British Home Office, which before the recent abolition of capital punishment in that country had the responsibility for selecting the cases from England and Wales which should receive the benefit of the Royal Prerogative of Mercy, observed:

> "The difficulty of defining by any statutory provision the types of murder which ought or ought not to be punished by death may be illustrated by reference to the many diverse considerations to which the Home Secretary has regard in deciding whether to recommend clemency. No simple formula can take account of the innumerable degrees of culpability,

and no formula which fails to do so can claim to be just or satisfy public opinion." 1–2 Royal Commission on Capital Punishment, Minutes of Evidence 13 (1949).

The Royal Commission accepted this view, and although it recommended a change in British practice to provide for discretionary power in the jury to find "extenuating circumstances," that term was to be left undefined; "[t]he decision of the jury would be within their unfettered discretion and in no sense governed by the principles of law." Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 553 (b). The Commission went on to say, in substantial confirmation of the views of the Home Office:

> "No formula is possible that would provide a reasonable criterion for the infinite variety of circumstances that may affect the gravity of the crime of murder. Discretionary judgment on the facts of each case is the only way in which they can be equitably distinguished. This conclusion is borne out by American experience: there the experiment of degrees of murder, introduced long ago, has had to be supplemented by giving to the courts a discretion that in effect supersedes it." Id., at ¶ 595.

The draftsmen of the Model Penal Code expressly agreed with the conclusion of the Royal Commission that "the factors which determine whether the sentence of death is the appropriate penalty in particular cases are too complex to be compressed within the limits of a simple formula . . . ." Report ¶ 498, quoted in Model Penal Code, § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959). The draftsmen did think, however, "that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed *and weighed against each other* when they are

presented in a concrete case." *Ibid.* The circumstances the draftsmen selected, set out in the Appendix to this opinion, were not intended to be exclusive. The Code provides simply that the sentencing authority should "take into account the aggravating and mitigating circumstances enumerated . . . and any other facts that it deems relevant," and that the court should so instruct when the issue was submitted to the jury. *Id.,* at § 210.6 (2) (Proposed Official Draft, 1962).[16] The Final Report of the National Commission on Reform of Federal Criminal Laws (1971) recommended entire abolition of the death penalty in federal cases. In a provisional chapter, prepared for the contingency that Congress might decide to retain the death penalty, the Report contains a set of criteria virtually identical with the aggravating and mitigating circumstances listed by the Model Penal Code. With respect to the use to be made of the criteria, the Report provides that: "[i]n deciding whether a sentence of death should be imposed, the court and the jury, if any, *may* consider the mitigating and aggravating circumstances set forth in the subsections below." *Id.,* at provisional § 3604 (1) (emphasis added).

---

[16] The Model Penal Code provides that the jury should not fix punishment at death unless it found at least one of the aggravating circumstances and no sufficiently substantial mitigating circumstances. Model Penal Code § 210.6 (2) (Proposed Official Draft, 1962). As the reporter's comment recognized, there is no fundamental distinction between this procedure and a redefinition of the class of potentially capital murders. Model Penal Code § 201.6, Comment 3, pp. 71–72 (Tent. Draft No. 9, 1959). As we understand these petitioners' contentions, they seek standards for guiding the sentencing authority's discretion, not a greater strictness in the definition of the class of cases in which the discretion exists. If we are mistaken in this, and petitioners contend that Ohio's and California's definitions of first-degree murder are too broad, we consider their position constitutionally untenable.

It is apparent that such criteria do not purport to provide more than the most minimal control over the sentencing authority's exercise of discretion. They do not purport to give an exhaustive list of the relevant considerations or the way in which they may be affected by the presence or absence of other circumstances. They do not even undertake to exclude constitutionally impermissible considerations.[17] And, of course, they provide no protection against the jury determined to decide on whimsy or caprice. In short, they do no more than suggest some subjects for the jury to consider during its deliberations, and they bear witness to the intractable nature of the problem of "standards" which the history of capital punishment has from the beginning reflected. Thus, they indeed caution against this Court's undertaking to establish such standards itself, or to pronounce at large that standards in this realm are constitutionally required.

In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution.[18] The

---

[17] The issue whether a defendant is entitled to an instruction that certain factors such as race are not to be taken into consideration is not before us, as the juries were told not to base their decisions on "prejudice," and no more specific instructions were requested. Cf. *Griffin* v. *California,* 380 U. S. 609, 614–615 and n. 6 (1965).

[18] *Giaccio* v. *Pennsylvania,* 382 U. S. 399 (1966), does not point to a contrary result. In *Giaccio* the Court held invalid on its face a Pennsylvania statute which authorized criminal juries to assess costs against defendants whose conduct, although not amounting to the crime with which they were charged, was nevertheless found to be "reprehensible." The Court concluded that the statute was no more sound than one which simply made it a crime to engage

States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of circumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless "boiler-plate" or a statement of the obvious that no jury would need.

## IV

As we noted at the outset of this opinion, McGautha's trial was in two stages, with the jury considering the issue of guilt before the presentation of evidence and argument on the issue of punishment. Such a procedure is required by the laws of California and of five other States.[19] Petitioner Crampton, whose guilt and punishment were determined at a single trial, contends

in "reprehensible conduct" and consequently that it was unconstitutionally vague. The Court there stated:

"In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits." *Id.*, at 405 n. 8.

[19] Cal. Penal Code § 190.1 (1970); Conn. Gen. Stat. Rev. § 53a–46 (Supp. 1969); Act of Mar. 27, 1970, No. 1333, Ga. Laws 1970, p. 949; N. Y. Penal Law §§ 125.30 (Supp. 1970–1971), 125.35 (1967); Pa. Stat. Ann., Tit. 18, § 4701 (1963); Tex. Code Crim. Proc., Art. 37.07 (2)(b) (Supp. 1970–1971). See also Model Penal Code § 210.6 (2) (Proposed Official Draft, 1962); National Commission on Reform of Federal Criminal Laws, Final Report, provisional § 3602 (1971); Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶¶ 551–595.

that a procedure like California's is compelled by the Constitution as well.

This Court has twice had occasion to rule on separate penalty proceedings in the context of a capital case. In *United States* v. *Jackson,* 390 U. S. 570 (1968), we held unconstitutional the penalty provisions of the Federal Kidnaping Act, which we construed to mean that a defendant demanding a jury trial risked the death penalty while one pleading guilty or agreeing to a bench trial faced a maximum punishment of life imprisonment. The Government had contended that in order to mitigate this discrimination we should adopt an alternative construction, authorizing the trial judge accepting a guilty plea or jury waiver to convene a special penalty jury empowered to recommend the death sentence. *Id.,* at 572. Our rejection of this contention was not based solely on the fact that it appeared to run counter to the language and legislative history of the Act. "[E]ven on the assumption that the failure of Congress to [provide for the convening of a penalty jury] was wholly inadvertent, it would hardly be the province of the courts to fashion a remedy. Any attempt to do so would be fraught with the gravest difficulties . . . ." *Id.,* at 578–579. We therefore declined "to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id.,* at 580. *Jackson,* however, did not consider the possibility that such a procedure might be constitutionally required in capital cases.

Substantially this result had been sought by the petitioners in *Spencer* v. *Texas,* 385 U. S. 554 (1967). Like Crampton, Spencer had been tried in a unitary proceeding before a jury which fixed punishment at death. Also like Crampton, Spencer contended that the Due Process

Clause of the Fourteenth Amendment required a bifurcated trial so that evidence relevant solely to the issue of punishment would not prejudice his case on guilt. We rejected this contention, in the following language:

"To say that the two-stage jury trial in the English-Connecticut style is probably the fairest, as some commentators and courts have suggested, and with which we might well agree were the matter before us in a legislative or rule-making context, is a far cry from a constitutional determination that this method of handling the problem is compelled by the Fourteenth Amendment. Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure. With recidivism the major problem that it is, substantial changes in trial procedure in countless local courts around the country would be required were this Court to sustain the contentions made by these petitioners. This we are unwilling to do. To take such a step would be quite beyond the pale of this Court's proper function in our federal system." *Id.,* at 567–568 (footnotes omitted).

*Spencer* considered the bifurcation issue in connection with the State's introduction of evidence of prior crimes; we now consider the issue in connection with a defendant's choice whether to testify in his own behalf. But even though this case cannot be said to be controlled by *Spencer,* our opinion there provides a significant guide to decision here.

A

Crampton's argument for bifurcation runs as follows. Under *Malloy* v. *Hogan,* 378 U. S. 1 (1964), and *Griffin* v. *California,* 380 U. S. 609 (1965), he enjoyed a constitutional right not to be compelled to be a witness

against himself. Yet under the Ohio single-trial procedure, he could remain silent on the issue of guilt only at the cost of surrendering any chance to plead his case on the issue of punishment. He contends that under the Due Process Clause of the Fourteenth Amendment, as elaborated in, *e. g., Townsend* v. *Burke,* 334 U. S. 736 (1948); *Specht* v. *Patterson,* 386 U. S. 605 (1967); and *Mempa* v. *Rhay,* 389 U. S. 128 (1967), he had a right to be heard on the issue of punishment and a right not to have his sentence fixed without the benefit of all the relevant evidence. Therefore, he argues, the Ohio procedure possesses the flaw we condemned in *Simmons* v. *United States,* 390 U. S. 377, 394 (1968); it creates an intolerable tension between constitutional rights. Since this tension can be largely avoided by a bifurcated trial, petitioner contends that there is no legitimate state interest in putting him to the election, and that the single-verdict trial should be held invalid in capital cases.

*Simmons,* however, dealt with a very different situation from the one which confronted petitioner Crampton, and not everything said in that opinion can be carried over to this case without circumspection. In *Simmons* we held it unconstitutional for the Federal Government to use at trial the defendant's testimony given on an unsuccessful motion to suppress evidence allegedly seized in violation of the Fourth Amendment. We concluded that to permit such use created an unacceptable risk of deterring the prosecution of marginal Fourth Amendment claims, thus weakening the efficacy of the exclusionary rule as a sanction for unlawful police behavior. This was surely an analytically sufficient basis for decision. However, we went on to observe that the penalty thus imposed on the good-faith assertion of Fourth Amendment rights was "of a kind to which this Court has always been peculiarly

sensitive," 390 U. S., at 393, for it involved the incrimination of the defendant out of his own mouth.

We found it not a little difficult to support this invocation of the Fifth Amendment privilege. We recognized that "[a]s an abstract matter" the testimony might be voluntary, and that testimony to secure a benefit from the Government is not *ipso facto* "compelled" within the meaning of the Self-Incrimination Clause. The distinguishing feature in Simmons' case, we said, was that "the 'benefit' to be gained is that afforded by another provision of the Bill of Rights." *Id.*, at 393–394. Thus the only real basis for holding that Fifth Amendment policies were involved was the colorable Fourth Amendment claim with which we had begun.

The insubstantiality of the purely Fifth Amendment interests involved in *Simmons* was illustrated last Term by the trilogy of cases involving guilty pleas: *Brady* v. *United States,* 397 U. S. 742 (1970); *McMann* v. *Richardson,* 397 U. S. 759 (1970); *Parker* v. *North Carolina,* 397 U. S. 790 (1970). While in *Simmons* we relieved the defendant of his "waiver" of Fifth Amendment rights made in order to obtain a benefit to which he was ultimately found not constitutionally entitled, in the trilogy we held the defendants bound by "waivers" of rights under the Fifth, Sixth, and Fourteenth Amendments made in order to avoid burdens which, it was ultimately determined, could not constitutionally have been imposed. In terms solely of Fifth Amendment policies, it is apparent that Simmons had a far weaker claim to be relieved of his ill-advised "waiver" than did the defendants in the guilty-plea trilogy. While we have no occasion to question the soundness of the result in *Simmons* and do not do so, to the extent that its rationale was based on a "tension" between constitutional rights and the policies behind them, the validity of that reasoning must now be regarded as open to question, and it certainly cannot be

given the broad thrust which is attributed to it by Crampton in the present case.

The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgments" as to which course to follow. *McMann* v. *Richardson*, 397 U. S., at 769. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved. Analysis of this case in such terms leads to the conclusion that petitioner has failed to make out his claim of a constitutional violation in requiring him to undergo a unitary trial.

## B

We turn first to the privilege against compelled self-incrimination. The contention is that where guilt and punishment are to be determined by a jury at a single trial the desire to address the jury on punishment unduly encourages waiver of the defendant's privilege to remain silent on the issue of guilt, or, to put the matter another way, that the single-verdict procedure unlawfully compels the defendant to become a witness against himself on the issue of guilt by the threat of sentencing him to death without having heard from him. It is not contended, nor could it be successfully, that the mere force of evidence is compulsion of the sort forbidden by the privilege. See *Williams* v. *Florida*, 399 U. S. 78, 83–85 (1970). It does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case. See *Spencer* v. *Texas*, 385 U. S., at 561 and n. 7; cf. *Michelson* v. *United States*, 335 U. S. 469 (1948). The narrow question left open is whether it is con-

sistent with the privilege for the State to provide no means whereby a defendant wishing to present evidence or testimony on the issue of punishment may limit the force of his evidence (and the State's rebuttal) to that issue. We see nothing in the history, policies, or precedents relating to the privilege which requires such means to be available.

So far as the history of the privilege is concerned, it suffices to say that it sheds no light whatever on the subject, unless indeed that which is adverse, resulting from the contrast between the dilemma of which petitioner complains and the historical excesses which gave rise to the privilege. See generally 8 J. Wigmore, Evidence § 2250 (McNaughton rev. ed. 1961); L. Levy, Origins of the Fifth Amendment (1968). Inasmuch as at the time of framing of the Fifth Amendment and for many years thereafter the accused in criminal cases was not allowed to testify in his own behalf, nothing approaching Crampton's dilemma could arise.

The policies of the privilege likewise are remote support for the proposition that defendants should be permitted to limit the effects of their evidence to the issue of punishment. The policies behind the privilege are varied, and not all are implicated in any given application of the privilege. See *Murphy* v. *Waterfront Commission,* 378 U. S. 52, 55 (1964); see generally 8 J. Wigmore, *supra,* at § 2251, and sources cited therein, n. 2. It can safely be said, however, that to the extent these policies provide any guide to decision, see McKay, Book Review, 35 N. Y. U. L. Rev. 1097, 1100–1101 (1960), the only one affected to any appreciable degree is that of "cruelty."

It is undeniably hard to require a defendant on trial for his life and desirous of testifying on the issue of punishment to make nice calculations of the effect of his testimony on the jury's determination of guilt. The issue of cruelty thus arising, however, is less closely akin

to "the cruel trilemma of self-accusation, perjury or contempt," *Murphy* v. *Waterfront Commission,* 378 U. S., at 55, than to the fundamental requirements of fairness and decency embodied in the Due Process Clauses. Whichever label is preferred, appraising such considerations is inevitably a matter of judgment as to which individuals may differ; however, a guide to decision is furnished by the clear validity of analogous choices with which criminal defendants and their attorneys are quite routinely faced.

It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. See, *e. g., Brown* v. *Walker,* 161 U. S. 591, 597–598 (1896); *Fitzpatrick* v. *United States,* 178 U. S. 304, 314–316 (1900); *Brown* v. *United States,* 356 U. S. 148 (1958). It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. See *Spencer* v. *Texas,* 385 U. S., at 561; cf. *Michelson* v. *United States,* 335 U. S. 469 (1948); but cf. *Luck* v. *United States,* 121 U. S. App. D. C. 151, 348 F. 2d 763 (1965); *United States* v. *Palumbo,* 401 F. 2d 270 (CA2 1968). Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.

Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty.

*E. g., United States* v. *Calderon,* 348 U. S. 160, 164 and n. 1 (1954); 2 C. Wright, Federal Practice and Procedure § 463 (1969); cf. American Bar Association, Project on Standards for Criminal Justice, Trial by Jury 107–108 (Approved Draft, 1968). But see Comment, The Motion for Acquittal: A Neglected Safeguard, 70 Yale L. J. 1151 (1961); cf. *Cephus* v. *United States,* 117 U. S. App. D. C. 15, 324 F. 2d 893 (1963). Finally, only last Term in *Williams* v. *Florida,* 399 U. S. 78 (1970), we had occasion to consider a Florida "notice-of-alibi" rule which put the petitioner in that case to the choice of either abandoning his alibi defense or giving the State both an opportunity to prepare a rebuttal and leads from which to start. We rejected the contention that the rule unconstitutionally compelled the defendant to incriminate himself. The pressures which might lead the defendant to furnish this arguably "testimonial" and "incriminating" information arose simply from

> "the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not compelled self-incrimination transgressing the Fifth and Fourteenth Amendments." *Id.,* at 85.

We are thus constrained to reject the suggestion that a desire to speak to one's sentencer unlawfully compels a defendant in a single-verdict capital case to incriminate himself, unless there is something which serves to distinguish sentencing—or at least capital sentencing—from the situations given above. Such a distinguishing factor can only be the peculiar poignancy of the position of a man whose life is at stake, coupled with the imponderables of the decision which the jury is called upon to make. We do not think that the fact that a defendant's sentence, rather than his guilt, is at issue creates a constitutionally sufficient difference from the sorts of situa-

tions we have described. While we recognize the truth of Mr. Justice Frankfurter's insight in *Green* v. *United States,* 365 U. S. 301, 304 (1961) (plurality opinion), as to the peculiar immediacy of a personal plea by the defendant for leniency in sentencing, it is also true that the testimony of an accused denying the case against him has considerably more force than counsel's argument that the prosecution's case has not been proved. The relevant differences between sentencing and determination of guilt or innocence are not so great as to call for a difference in constitutional result. Nor does the fact that capital, as opposed to any other, sentencing is in issue seem to us to distinguish this case. See *Williams* v. *New York,* 337 U. S. 241, 251–252 (1949). Even in noncapital sentencing the sciences of penology, sociology, and psychology have not advanced to the point that sentencing is wholly a matter of scientific calculation from objectively verifiable facts.

We conclude that the policies of the privilege against compelled self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt. We therefore turn to the converse situation, in which a defendant remains silent on the issue of guilt and thereby loses any opportunity to address the jury personally on punishment.

## C

It is important to identify with particularity the interests which are involved. Petitioner speaks broadly of a right of allocution. This right, of immemorial origin, arose in a context very different from that which confronted petitioner Crampton.[20] See generally Barrett,

---

[20] For instance, the accused was not permitted to have the assistance of counsel, was not permitted to testify in his own behalf, was not entitled to put on evidence in his behalf, and had almost no

Allocution (pts. 1–2), 9 Mo. L. Rev. 115, 232 (1944). It has been preserved in its original form in Ohio and in many other States.[21] What petitioner seeks, to be sure for purposes not wholly unrelated to those served by the right of allocution in former times, see *Green* v. *United States*, 365 U. S., at 304 (opinion of Frankfurter, J.), is nevertheless a very different procedure occurring in a radically different framework of criminal justice.

Leaving aside the term "allocution," it also appears that petitioner is not claiming the right simply to be heard on the issue of punishment. This Court has not directly determined whether or to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so.[22] Assuming, without de-

possibility of review of his conviction. See, *e. g.*, G. Williams, The Proof of Guilt 4–12 (3d ed. 1963); 1 J. Stephen, A History of the Criminal Law of England 308–311, 350 (1883).

[21] Ohio Rev. Code Ann. § 2947.05 (1954) provides:

"Before sentence is pronounced, the defendant must be informed by the court of the verdict of the jury, or the finding of the court, and asked whether he has anything to say as to why judgment should not be pronounced against him."

[22] In *Williams* v. *New York*, 337 U. S. 241 (1949), a trial judge had disregarded a jury recommendation of mercy and imposed the death sentence, in part because of a presentence report based on hearsay. The Court held that the Due Process Clause did not require a State to choose between prohibiting the use of such reports and holding an adversary hearing at which the defendant could cross-examine the sources of the information contained therein. In *Specht* v. *Patterson*, 386 U. S. 605, 606 (1967), the Court characterized *Williams* broadly as holding that the Fourteenth Amendment "did not require a judge to have hearings and to give a convicted person an opportunity to participate in those hearings when he came to determine the sentence to be imposed." The Court stated that it adhered to *Williams*, but declined to extend it to a separate determination whether a convicted person should be committed to an institution for treatment under the Colorado Sex

ciding, that the Constitution does require such an opportunity, there was no denial of such a right in Crampton's case. The Ohio Constitution guarantees defendants the right to have their counsel argue in summation for mercy as well as for acquittal. *Shelton* v. *State,* 102 Ohio St. 376, 131 N. E. 704 (1921). The extent to which evidence going solely to the issue of punishment is admissible under Ohio law is unclear, see *Ashbrook* v. *State,* 49 Ohio App. 298, 197 N. E. 214 (1935), but in any event it seems apparent that Ohio judges, as one would expect, take a lenient view of the admissibility of evidence offered by a defendant on trial for his life. As the present case illustrates, an accused can put before the jury a great deal of background evidence with at best a tenuous connection to the issue of guilt. The record in Crampton's case does not reveal that any evidence offered on the part of the defendant was excluded on the ground that it was relevant solely to the issue of punishment.

On the other hand, petitioner is not seeking vindication for his interest in making a personal plea for mercy.[23]

---

Offenders Act. *Id.,* at 608. See also *Mempa* v. *Rhay,* 389 U. S. 128 (1967).

In *Green* v. *United States,* 365 U. S. 301, 304 (1961), Mr. Justice Frankfurter, in an opinion for four members of the Court, spoke eloquently of the desirability of permitting a defendant's personal plea for mercy, but in *Hill* v. *United States,* 368 U. S. 424 (1962), the Court held that the failure of a sentencing judge to ask a defendant represented by counsel whether he personally had anything to say, though a violation of Fed. Rule Crim. Proc. 32 (a), was not an error of constitutional dimensions. The Court reserved the issue whether silencing a defendant who wished to speak would rise to that level. *Id.,* at 429. We have not since had occasion to deal with this or related problems at length.

[23] It may be noted in passing that petitioner at no point requested an opportunity to address the jury personally on the issue of punishment. Compare the Georgia practice of permitting the defendant to make an unsworn statement on which he is not subject to cross-

Even in a bifurcated trial, the defendant could be restricted to the giving of evidence, with argument to be made by counsel only. Petitioner's contention therefore comes down to the fact that the Ohio single-verdict trial may deter the defendant from bringing to the jury's attention evidence peculiarly within his own knowledge, and it may mean that the death verdict will be returned by a jury which never heard the sound of his voice. We do not think that the possibility of the former is sufficiently great to sustain petitioner's claim that the single-verdict trial may deprive the jury of a rational basis for fixing sentence. Assuming that in this case there was relevant information solely within petitioner's knowledge, we do not think the Constitution forbids a requirement that such evidence be available to the jury on all issues to which it is relevant or not at all. As to the largely symbolic value represented by the latter interest, Ohio has provided for retention of the ritual of allocution, albeit only in its common-law form, precisely to avoid the possibility that a person might be tried, convicted, and sentenced to death in complete silence. We have held that failure to ensure such personal participation in the criminal process is not necessarily a constitutional flaw in the conviction. *Hill* v. *United States,* 368 U. S. 424 (1962). We do not think that Ohio was required to provide an opportunity for petitioner to speak to the jury free from any adverse consequences on the issue of guilt. We therefore reject this branch of petitioner's argument as well.

## V

Before we conclude this opinion, it is appropriate for us to make a broader observation than the issues raised by

examination, and the deprecating view of this opportunity taken by those familiar with it, all discussed in *Ferguson* v. *Georgia,* 365 U. S. 570 (1961).

these cases strictly call for. It may well be, as the American Law Institute and the National Commission on Reform of Federal Criminal Laws have concluded, that bifurcated trials and criteria for jury sentencing discretion are superior means of dealing with capital cases if the death penalty is to be retained at all. But the Federal Constitution, which marks the limits of our authority in these cases, does not guarantee trial procedures that are the best of all worlds, or that accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court. See *Spencer* v. *Texas*, 385 U. S. 554 (1967). The Constitution requires no more than that trials be fairly conducted and that guaranteed rights of defendants be scrupulously respected. From a constitutional standpoint we cannot conclude that it is impermissible for a State to consider that the compassionate purposes of jury sentencing in capital cases are better served by having the issues of guilt and punishment determined in a single trial than by focusing the jury's attention solely on punishment after the issue of guilt has been determined.

Certainly the facts of these gruesome murders bespeak no miscarriage of justice. The ability of juries, unassisted by standards, to distinguish between those defendants for whom the death penalty is appropriate punishment and those for whom imprisonment is sufficient is indeed illustrated by the discriminating verdict of the jury in McGautha's case, finding Wilkinson the less culpable of the two defendants and sparing his life.

The procedures which petitioners challenge are those by which most capital trials in this country are conducted, and by which all were conducted until a few years ago. We have determined that these procedures are consistent with the rights to which petitioners were constitutionally entitled, and that their trials were entirely fair. Having

reached these conclusions we have performed our task of measuring the States' process by federal constitutional standards, and accordingly the judgment in each of these cases is

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT

Model Penal Code § 210.6 (Proposed Official Draft, 1962, and changes of July 30, 1962):

(1) *Death Sentence Excluded.* When a defendant is found guilty of murder, the Court shall impose sentence for a felony of the first degree if it is satisfied that:

(a) none of the aggravating circumstances enumerated in Subsection (3) of this Section was established by the evidence at the trial or will be established if further proceedings are initiated under Subsection (2) of this Section; or

(b) substantial mitigating circumstances, established by the evidence at the trial, call for leniency; or

(c) the defendant, with the consent of the prosecuting attorney and the approval of the Court, pleaded guilty to murder as a felony of the first degree; or

(d) the defendant was under 18 years of age at the time of the commission of the crime; or

(e) the defendant's physical or mental condition calls for leniency; or

(f) although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt.

(2) *Determination by Court or by Court and Jury.* Unless the Court imposes sentence under Subsection (1) of this Section, it shall conduct a separate proceeding to determine whether the defendant should be sentenced for a felony of the first degree or sentenced to death. The proceeding shall be conducted before the Court alone

if the defendant was convicted by a Court sitting without a jury or upon his plea of guilty or if the prosecuting attorney and the defendant waive a jury with respect to sentence. In other cases it shall be conducted before the Court sitting with the jury which determined the defendant's guilt or, if the Court for good cause shown discharges that jury, with a new jury empanelled for the purpose.

In the proceeding, evidence may be presented as to any matter that the Court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition and any of the aggravating or mitigating circumstances enumerated in Subsections (3) and (4) of this Section. Any such evidence, not legally privileged, which the court deems to have probative force, may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant's counsel is accorded a fair opportunity to rebut such evidence. The prosecuting attorney and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

The determination whether sentence of death shall be imposed shall be in the discretion of the Court, except that when the proceeding is conducted before the Court sitting with a jury, the Court shall not impose sentence of death unless it submits to the jury the issue whether the defendant should be sentenced to death or to imprisonment and the jury returns a verdict that the sentence should be death. If the jury is unable to reach a unanimous verdict, the Court shall dismiss the jury and impose sentence for a felony of the first degree.

The Court, in exercising its discretion as to sentence, and the jury, in determining upon its verdict, shall take into account the aggravating and mitigating circumstances enumerated in Subsections (3) and (4) and any

other facts that it deems relevant, but it shall not impose or recommend sentence of death unless it finds one of the aggravating circumstances enumerated in Subsection (3) and further finds that there are no mitigating circumstances sufficiently substantial to call for leniency. When the issue is submitted to the jury, the Court shall so instruct and also shall inform the jury of the nature of the sentence of imprisonment that may be imposed, including its implication with respect to possible release upon parole, if the jury verdict is against sentence of death.

[Alternative version of Subsection (2), providing for determination of sentence by the Court in all cases, omitted.]

(3) *Aggravating Circumstances.*

(a) The murder was committed by a convict under sentence of imprisonment.

(b) The defendant was previously convicted of another murder or of a felony involving the use or threat of violence to the person.

(c) At the time the murder was committed the defendant also committed another murder.

(d) The defendant knowingly created a great risk of death to many persons.

(e) The murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

(f) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

(g) The murder was committed for pecuniary gain.

(h) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

(4) *Mitigating Circumstances.*

(a) The defendant has no significant history of prior criminal activity.

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(d) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

(e) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

(f) The defendant acted under duress or under the domination of another person.

(g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.

(h) The youth of the defendant at the time of the crime.

Separate opinion of Mr. Justice Black.

I concur in the Court's judgments and in substantially all of its opinion. However, in my view, this Court's task is not to determine whether the petitioners' trials were "fairly conducted." *Ante,* at 221. The Constitution grants this Court no power to reverse convictions because of our personal beliefs that state criminal procedures are "unfair," "arbitrary," "capricious," "unreasonable," or "shocking to our conscience." See, *e. g., Rochin* v. *California,* 342 U. S. 165, 174 (1952) (Black, J., concurring); *United States* v. *Wade,* 388 U. S. 218, 243 (1967) (Black, J., concurring and dissenting). Our

226

responsibility is rather to determine whether petitioners have been denied rights expressly or impliedly guaranteed by the Federal Constitution as written. I agree with the Court's conclusions that the procedures employed by California and Ohio to determine whether capital punishment shall be imposed do not offend the Due Process Clause of the Fourteenth Amendment. Likewise, I do not believe that petitioners have been deprived of any other right explicitly or impliedly guaranteed by the other provisions of the Bill of Rights. The Eighth Amendment forbids "cruel and unusual punishments." In my view, these words cannot be read to outlaw capital punishment because that penalty was in common use and authorized by law here and in the countries from which our ancestors came at the time the Amendment was adopted. It is inconceivable to me that the framers intended to end capital punishment by the Amendment. Although some people have urged that this Court should amend the Constitution by interpretation to keep it abreast of modern ideas, I have never believed that lifetime judges in our system have any such legislative power. See *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 670 (1966) (BLACK, J., dissenting).

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting in No. 204.

In my view the unitary trial which Ohio provides in first-degree murder cases does not satisfy the requirements of procedural Due Process under the Fourteenth Amendment.

Ohio makes first-degree murder punishable by death "unless the jury trying the accused recommends mercy, in which case the punishment shall be imprisonment for life." Ohio Rev. Code Ann. § 2901.01. Petitioner

was indicted and tried for murder in the first degree for the killing of his wife. His pleas were "not guilty" and "not guilty by reason of insanity."

The court, after a psychiatric examination, concluded that petitioner was sane and set the case for trial before a jury. The issues of guilt, punishment, and insanity were simultaneously tried and submitted to the jury.

Petitioner did not testify at the trial. But a psychiatrist testified on his behalf, offering medical records of his case from two state hospitals. His mother testified concerning his childhood, education, and background.

On the issue of punishment the jury was charged:

"You must not be influenced by any consideration *of sympathy or prejudice.* It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the court to your findings and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict.

"Consider all the evidence and make your finding with intelligence and impartiality, and *without bias, sympathy, or prejudice,* so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried. . . ." (Emphasis added.)

He was found guilty of murder in the first degree without a recommendation of mercy and the court sentenced him to death. The Supreme Court of Ohio sustained the single-verdict procedure and the absolute discretion of the jury in the matter of punishment. 18 Ohio St. 2d 182, 248 N. E. 2d 614.

On the issue of guilt the State was required to produce evidence to establish it. On the issue of insanity the burden was on petitioner to prove it by a preponderance of the evidence, *State* v. *Austin,* 71 Ohio St. 317, 73

N. E. 218.   On the issue of mercy, *viz.*, life imprison-
ment rather than death, petitioner under Ohio law was
banned from offering any specific evidence directed only
toward a claim of mercy.   *Ashbrook* v. *State*, 49 Ohio
App. 298, 197 N. E. 214.

If a defendant wishes to testify in support of the
defense of insanity or in mitigation of what he is
charged with doing, he can do so only if he surrenders
his right to be free from self-incrimination.   Once he
takes the stand he can be cross-examined not only as
respects the crime charged but also on other misdeeds.
In Ohio impeachment covers a wide range of subjects:
prior convictions for felonies and statutory misde-
meanors,[1] pending indictments,[2] prior convictions in mili-
tary service, and dishonorable discharges.[3]   Once he
testifies he can be recalled for cross-examination in the
State's case in rebuttal.[4]

While the defendant in Ohio has the right of allocu-
tion, that right even in first-degree murder cases occurs
only after the jury's verdict has been rendered.   Unless
there is prejudicial error vitiating the conviction or in-
sufficient evidence [5] to convict, the jury's verdict stands
and the judge must enter the verdict.   Allocution,
though mandatory,[6] is thus a ritual only.[7]

---

[1] *State* v. *Murdock*, 172 Ohio St. 221, 174 N. E. 2d 543.   And
see *State* v. *Pollard*, 21 Ohio St. 2d 171, 256 N. E. 2d 620.

[2] *State* v. *Hector*, 19 Ohio St. 2d 167, 249 N. E. 2d 912.

[3] *State* v. *Williams*, 85 Ohio App. 236, 88 N. E. 2d 420.   Merely
taking the stand puts credibility in issue.   *Hamilton* v. *State*, 39
Ohio App. 153, 177 N. E. 221.

[4] *Johns* v. *State*, 42 Ohio App. 412, 182 N. E. 356.

[5] *State* v. *Frohner*, 150 Ohio St. 53, 80 N. E. 2d 868; *Hoppe* v.
*State*, 29 Ohio App. 467, 163 N. E. 715.

[6] *Silsby* v. *State*, 119 Ohio St. 314, 164 N. E. 232.

[7] "At common law the defendant in a felony case had a right, called
'allocution,' to be asked formally whether he had 'any thing to
offer why judgment should not be awarded against him.'   .   .   .   [S]ince

If the right to be heard were to be meaningful, it would have to accrue before sentencing; yet, except for allocution, any attempt on the part of the accused during the trial to say why the judgment of death should not be pronounced against him entails a surrender of his right against self-incrimination. It therefore seems plain that the single-verdict procedure is a burden on the exer-

---

the common law judge generally had no discretion as to the quantum of punishment in felony cases, the point of his question to the defendant was not to elicit mitigating evidence or a plea for leniency, but to give the defendant a formal opportunity to present one of the strictly defined legal reasons which required the avoidance or delay of sentencing: he was not the person convicted, he had benefit of clergy or a pardon, he was insane, or if a woman, she was pregnant." Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv. L. Rev. 821, 832–833.

"The common law right of the defendant to be asked if he wishes to make a statement on his own behalf at the time of sentencing would appear still to be recognized in more than half of the American jurisdictions, although it finds expression in many forms and comes from many sources. In at least one state, the right rises to a constitutional level. See R. I. Const. art. I, § 10; Robalewski v. Superior Court, 197 A. 2d 751 (R. I. 1964). In many more states the right is guaranteed by statute. For a representative sample, see Cal. Penal Code §§ 1200, 1201 (1956); Iowa Code Ann. § 789.6 (1950); Kan. Gen. Stat. Ann. § 62–1510 (1964); Mo. Rev. Stat. §§ 546.570, 546.580 (1953); N. Y. Code Crim. Proc. § 480 (1958); Okla. Stat. Ann. tit. 22, § 970 (1958); Tex. Code Crim. Proc. art. 42.07 (1966); Wash. Rev. Code Ann. § 10.64.040 (1961). See also 48 Iowa L. Rev. 172, 173–74 n. 11 (1962). In a few more jurisdictions, the right is secured by rules of court. See, e. g., N. J. Crim. Prac. Rules, Superior and County Courts, Rule 3:7–10 (d) (1967); Fed. Rule Crim. Proc. 32 (a) (1). See also 39 F. R. D. 192–193 (1966); Hill v. United States, 368 U. S. 424 (1962); Green v. United States, 365 U. S. 301 (1961). In other jurisdictions, case law is the only source of the defendant's right. See Barrett, Allocution, 9 Mo. L. Rev. 115, 126–40 (1944)." American Bar Association, Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures 254–255 (Approved Draft, 1968).

230

cise of the right to be free of compulsion as respects self-incrimination. For he can testify on the issue of insanity or on other matters in extenuation of the crime charged only at the price of surrendering the protection of the Self-Incrimination Clause of the Fifth Amendment made applicable to the States by the Fourteenth.

On the question of insanity and punishment the accused should be under no restraints when it comes to putting before the court and the jury all the relevant facts. Yet he cannot have that freedom where these issues are tied to the question of guilt. For on that issue he often dare not speak lest he in substance be tried not for this particular offense but for all the sins he ever committed.

Petitioner also had to surrender much of his right to a fair hearing on the issue of punishment to assert his defense of insanity. To support his insanity plea he had to submit his hospital records, both of which contained information about his convictions and imprisonment for prior crimes and about his use of drugs as well.

Of course, a defendant's character witnesses can be examined respecting the defendant's other crimes. *Michelson* v. *United States,* 335 U. S. 469. But that is an effort to weigh the credibility of the proffered testimony as to character. "Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans." *Id.,* at 479. It is a far cry, however, to let hospital records tendered on an issue of insanity color a jury's judgment on the wholly different issue of guilt.

The greatest comfort the majority has is this Court's recent decision in *Spencer* v. *Texas,* 385 U. S. 554, holding that a two-stage trial is not required when a State

under a habitual-offender statute seeks to introduce on the issue of guilt in a unitary trial evidence of a defendant's prior convictions. Yet *Spencer* was a five-to-four decision which meant it barely passed muster as a constitutional procedure. The dissent of Mr. Chief Justice Warren, in which three other Justices joined, will have, I think, endurance beyond the majority view.

That dissent, *id.*, at 569 *et seq.*, points out the prejudice to an accused if, prior to a finding of guilt, earlier convictions are admissible in evidence. There is mounting evidence shown in court decisions (*id.*, at 585) and in modern state procedures that that practice does not comport with fairness implicit in due process. Mr. Chief Justice Warren said: "In England, the prejudice which results from proof of prior crimes before a finding of guilt has been recognized for more than a century, and the rule has been that a finding as to prior crimes is made in a separate hearing after the finding of guilt." *Id.*, at 586.

We should not square with due process the practice which receives impetus in Ohio where reports on a man's insanity contain references to his criminal record which most assuredly prejudice his trial on the issue of guilt.[8]

---

[8] As Mr. Chief Justice Warren said:

"Whether or not a State has recidivist statutes on its books, it is well established that evidence of prior convictions may not be used by the State to show that the accused has a criminal disposition and that the probability that he committed the crime currently charged is increased. While this Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, our decisions exercising supervisory power over criminal trials in federal courts, as well as decisions by courts of appeals and of state courts, suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause." *Spencer* v. *Texas*, 385 U. S., at 572–574.

We have already traveled part of the distance required for reversal in the present case. In *Jackson* v. *Denno*, 378 U. S. 368, we held that whether on controverted facts a confession was voluntary must be tried by a State in a separate proceeding. We pointed out the vice in allowing the jury that determines guilt also to determine whether the confession was voluntary. We said:

> "It is difficult, if not impossible, to prove that a confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is the course it took, was affected by the other evidence showing the confession was true. But the New York procedure poses substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined." *Id.,* at 389.

Yet the risk of prejudice in *Jackson* v. *Denno* seems minor compared with the risk of prejudice in a unitary trial where the issues of guilt, insanity, and punishment are combined, submitted to one jury with evidence of prior convictions coming in under cover of hospital records pertinent to insanity, and certainly likely to be prejudicial on the issue of guilt. I see no way to make this unitary trial fair in the sense of procedural due process unless the issue of insanity is segregated and tried to a separate jury.

As noted, evidence as to whether the jury should show mercy to him is excluded from consideration, and the jury is admonished not to show any "sympathy" to the accused.

Under Ohio law the determination of whether to grant or withhold mercy is exclusively for the jury and cannot

be reviewed by either the trial court [9] or an appellate court.[10] The first time that specific mention of mercy to the jury is permissible is during closing argument where the defendant is permitted "to argue to the jury the desirability, advisability or wisdom of recommending mercy." [11] While there was not a specific instruction on mercy in the instant case (beyond the instruction to make findings without bias, sympathy, or prejudice), the Ohio courts have approved instructions "to consider and determine whether or not in view of all the circumstances and facts leading up to, and attending the alleged homicide as disclosed by the evidence, you should or should not make such recommendation [of mercy]." *Howell v. State,* 102 Ohio St. 411, 413, 131 N. E. 706–707. This instruction means that while the jury may not consider general sociological or environmental data, it may consider any such factors which have specifically been admitted into evidence in the case for other purposes. *State v. Caldwell,* 135 Ohio St. 424, 21 N. E. 2d 343.[12]

---

[9] *Turner v. State,* 21 Ohio Law Abs. 276; *State v. Klumpp,* 15 Ohio Op. 2d 461, 175 N. E. 2d 767.

[10] *State v. Ames,* 50 Ohio Law Abs. 311, 80 N. E. 2d 168. The result is the same if the sentencing decision is based on a guilty plea or a jury waiver. *State v. Lucear,* 93 Ohio App. 281, 109 N. E. 2d 39; *State v. Ferguson,* 175 Ohio St. 390, 195 N. E. 2d 794.

[11] *Shelton v. State,* 102 Ohio St. 376, 131 N. E. 704 (syllabus).

[12] In *Caldwell* the jury was initially instructed: "[W]hether you recommend or withhold mercy is a matter solely within your discretion, calling for the exercise of your very best and most profound judgment, not motivated by considerations of sympathy or as a means of escaping a hard or disagreeable duty, but must be considered by you in the light of all the circumstances of the case with respect to the evidence submitted to you and the other circumstances surrounding this defendant." Following some deliberation the jury returned for special instructions and the following occurred:

Court: "You should determine whether or not in your discretion

*Ashbrook* v. *State, supra,* holds that evidence "directed specifically toward a claim for mercy" cannot be introduced. Yet *Howell, Caldwell,* and *Ashbrook* show that once evidence is admitted for other purposes the jury is free to consider it for any purpose. In *Caldwell* the objection of the court was to going *outside the record* for evidence in considering sociological and environmental matters.

This background evidence often comes in through character witnesses. In one case a defendant presented 12 witnesses who testified to his reputation as a peaceful and law-abiding citizen of good character.[13] And even in the instant case petitioner's mother testified concerning his childhood, education, and background.

---

mercy should be granted from a consideration of the evidence, the character of the crime and the attending circumstances."

Foreman: "What are extenuating circumstances? Are they something which we can determine in our own judgment alone?"

Court: "No, if there are any, you must determine them from the evidence."

Foreman: "Well, then, may we consider sociological matters and environment in determining this question of granting mercy?"

Court: "No—they have nothing whatever to do with this case."

At this point defense counsel requested the following instruction:

"In determining whether or not in your discretion you shall grant mercy to the defendant, you may consider environmental factors and sociological conditions, and in determining whether or not these factors exist you shall consider all the evidence permitted to go to you in this case, and all reasonable inferences to be derived therefrom. You may also consider, in making up your mind on the question of mercy, the appearance, demeanor and actions of the defendant as you have seen him here in open court."

The Ohio Supreme Court held it was not error to refuse to give this instruction because it was "substantially identical with those contained in the answers of the court to the jury, and its subject-matter was covered in the general charge. There was no occasion for repetition." 135 Ohio St., at 425–428, 21 N. E. 2d, at 344–345.

[13] *State* v. *Lucear, supra,* n. 10.

But the right of allocution is at best partial and incomplete when the accused himself is barred from testifying on the question of sentencing, and when the only evidence admissible comes from other people or is introduced for different and more limited purposes.

The line between the legislative function and the judicial function is clear. The State can make criminal such conduct as it pleases, save as it is limited by the Constitution itself, as for example by the ban on *ex post facto* laws in Art. I, § 10, or by the Fourteenth Amendment, as where religious exercises or freedom of speech or of the press is involved. It can punish such conduct by such penalties as it chooses, save as its sanctions run afoul of the ban in Art. I, § 10, against bills of attainder or the prohibition against cruel and unusual punishments contained in the Eighth Amendment. The Court is not concerned with the wisdom of state policies, only with the constitutional barriers to state action. Procedural due process [14] is one of those barriers, as revealed over and over again in our decisions. Some of its requirements are explicit in the Bill of Rights—a speedy trial, *Klopfer* v. *North Carolina,* 386 U. S. 213; a trial by jury, *Duncan* v. *Louisiana,* 391 U. S. 145; the right to counsel, *Gideon* v. *Wainwright,* 372 U. S. 335; the right to confrontation, *Pointer* v. *Texas,* 380 U. S. 400—all as made applicable to the States by reason of the Fourteenth Amendment.

Other requirements of procedural due process are only implied, not expressed; their inclusion or exclusion turns on the basic question of fairness. In that category are notice and the right to be heard. *Schroeder* v. *City of*

---

[14] There have been recurring demands that the Due Process Clause be abolished. See Clark, Some Recent Proposals for Constitutional Amendment, 12 Wis. L. Rev. 313, 324–326 (1937). Others have suggested that due process—apart from the specifics in the Bill of Rights—should mean only such notice, procedures, hearings, or trials

*New York,* 371 U. S. 208; *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337. It is a phase of that right to be heard that looms large here.

Crampton had the constitutional right as a matter of procedural due process to be heard on the issue of punishment. We emphasized in *Townsend* v. *Burke,* 334 U. S. 736, 741, how the right to be heard through counsel might be crucial to avoid sentencing on a foundation "extensively and materially false." But the right to be heard is broader than that; it includes the right to speak for one's self. As was said in *Green* v. *United States,* 365 U. S. 301, 304 (opinion of Frankfurter, J.):

> "We are not unmindful of the relevant major changes that have evolved in criminal procedure since the seventeenth century—the sharp decrease in the number of crimes which were punishable by death, the right of the defendant to testify on his own behalf, and the right to counsel. But we see

---

as are prescribed by Congress or the States. See Burns, The Death of E Pluribus Unum, 19 DePaul L. Rev. 651, 682 (1970).

The critics of the existing regime have been numerous. Mr. Justice Frankfurter once said: "[T]he ultimate justification for nullifying or saying that what Congress did, what the President did, what the legislature of Massachusetts or New York or any other state did was beyond its power, is that provision of the Constitution which protects liberty against infringement without due process of law. There are times, I can assure you—more times than once or twice—when I sit in this chair and wonder whether that isn't too great a power to give to any nine men, no matter how wise, how well disciplined, how disinterested. It covers the whole gamut of political, social, and economic activities." Of Law and Life and Other Things That Matter 129 (1965).

Yet none of us, I dare say, would conclude that (apart from constitutional specifics) any notice, any procedure, any form of hearings, any type of trial prescribed by any legislature would pass muster under procedural due process. Our present disagreement relates to what is essential for a fair trial, if the conventional, historic standards of procedural due process are to apply.

no reason why a procedural rule should be limited
to the circumstances under which it arose if reasons
for the right it protects remain. None of these
modern innovations lessens the need for the de-
fendant, personally, to have the opportunity to
present to the court his plea in mitigation. The
most persuasive counsel may not be able to speak
for a defendant as the defendant might, with halt-
ing eloquence, speak for himself."

The right to be heard, explicit in Rule 32 (a) of the
Federal Rules of Criminal Procedure, may at times be
denied, absent a showing of "aggravating circumstances"
or of a claim that the defendant would have anything
to say. See *Hill* v. *United States,* 368 U. S. 424. But
where the opportunity to be heard on the sentence is de-
nied both counsel and the defendant, the denial reaches
constitutional proportions. See *United States* v. *John-
son,* 315 F. 2d 714, 717.

Whether the voice speaking for the defendant be
counsel's voice or the defendant's, the right to be heard
is often vital at the sentencing stage before the law decides
the punishment of the person found guilty. *Mempa* v.
*Rhay,* 389 U. S. 128, 135. The hearing, whether on guilt
or punishment, is governed by the requirements of due
process. We said in *Specht* v. *Patterson,* 386 U. S. 605,
610:

"Due process, in other words, requires that he be
present with counsel, have an opportunity to be
heard, be confronted with witnesses against him,
have the right to cross-examine, and to offer evidence
of his own."

If one insists, as in *Hill,* that there be "aggravating
circumstances" to raise this right to be heard to a con-
stitutional level, all must agree that no one can ever
show more "aggravating" circumstances than the fact

that he stands on the verge of receiving the death sentence.

At least then, the right of allocution becomes a constitutional right—the right to speak to the issues touching on sentencing before one's fate is sealed. Yet where the trial is a unitary one, the right of allocution even in a capital case is theoretical, not real, as the Ohio procedure demonstrates. Petitioner also had the protection of the Self-Incrimination Clause of the Fifth Amendment. To obtain the benefit of the former he would have to surrender the latter. MR. JUSTICE HARLAN, speaking for the Court, said in *Simmons* v. *United States,* 390 U. S. 377, 394: "[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another."

We made that statement in the context of a case where an accused testified on a motion to suppress evidence in order to protect his Fourth Amendment rights but later discovered that the testimony would be used by the prosecution as "a strong piece of evidence against him." *Id.,* at 391. We held that the protection of his Fourth Amendment rights did not warrant surrender or dilution of his Fifth Amendment rights.

In *United States* v. *Jackson,* 390 U. S. 570, we held unenforceable a federal statute which made the death penalty applicable only to those who contested their guilt before a jury. In that case the "undeniable tension" was between Fifth Amendment rights and Sixth Amendment rights. MR. JUSTICE STEWART speaking for the Court said: "The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those

who choose to exercise them, then it would be patently unconstitutional." *Id.,* at 581.

That "undeniable tension" between two constitutional rights, which led to that result in *Jackson* and to a reversal in *Simmons,* should lead to a reversal here. For the unitary trial or single-verdict trial in practical effect allows the right to be heard on the issue of punishment only by surrendering the protection of the Self-Incrimination Clause of the Fifth Amendment.

The Court of Appeals for the Second Circuit indicated in *United States* v. *Branker,* 418 F. 2d 378, 380, that *Simmons* prevented an accused's testimony at a hearing on his application to proceed *in forma pauperis* and for appointment of counsel to be used by the prosecution as part of its direct case against him:

> "The defendant should enjoy his constitutional rights to counsel and to appeal and the means of supporting his assertion of these rights by his own testimony without running the risk that thereby he may be incriminating himself with respect to the charges pending against him."

The same result was reached by the Court of Appeals for the District of Columbia Circuit in *Melson* v. *Sard,* 131 U. S. App. D. C. 102, 402 F. 2d 653, which held that a parolee who testifies on a hearing in revocation of his parole may give testimony that may not be used in a subsequent criminal trial in violation of the Self-Incrimination Clause of the Fifth Amendment:

> "If a parolee is not given the full and free ability to testify in his own behalf and present his case against revocation, his right to a hearing before the Board would be meaningless. Furthermore, his Fifth Amendment rights must not be conditioned 'by the exaction of a price.'" *Id.,* at 104, 402 F. 2d, at 655.

The words "by the exaction of a price" are from *Garrity* v. *New Jersey,* 385 U. S. 493, 500, where we held that the threat of discharge of a policeman cannot be used to secure incriminatory evidence against him. We said:

> "There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. Engaging in interstate commerce is one. . . . Resort to the federal courts in diversity of citizenship cases is another. . . . Assertion of a First Amendment right is still another. . . . The imposition of a burden on the exercise of a Twenty-fourth Amendment right is also banned. . . . We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Ibid.*

*Melson* v. *Sard* involved protection of a statutory right to a hearing. *Garrity* involved only employment rights. In the same category is *Thomas* v. *United States,* 368 F. 2d 941, where the Court of Appeals for the Fifth Circuit held a convicted man may not receive a harsher penalty than he would have received if he had waived his Fifth Amendment right. And the Court of Appeals for the District of Columbia Circuit expressed the same view in *Scott* v. *United States,* 135 U. S. App. D. C. 377, 419 F. 2d 264.

If exaction of a constitutional right may not be made for assertion of a statutory right (such as the right to a hearing on parole revocation or the right to appeal), it follows *a fortiori* that the constitutional right to be free from the compulsion of self-incrimination may not be

exacted as a condition to the constitutional right to be heard on the issue of punishment.

The truth is, as MR. JUSTICE BRENNAN points out in his dissent in these cases, that the wooden position of the Court, reflected in today's decision, cannot be reconciled with the evolving gloss of civilized standards which this Court, long before the time of those who now sit here, has been reading into the protective procedural due process safeguards of the Bill of Rights. It is as though a dam had suddenly been placed across the stream of the law on procedural due process, a stream which has grown larger with the passing years.

The Court has history on its side—but history alone. Though nations have been killing men for centuries, felony crimes increase. The vestiges of law enshrined today have roots in barbaric procedures. Barbaric procedures such as ordeal by battle that became imbedded in the law were difficult to dislodge.[15] Though torture was used to exact confessions, felonies mounted. Once it was thought that "sanity" was determined by ascertaining whether a person knew the difference between "right" and "wrong." Once it was a capital offense to steal from the person something "above the value of a shilling."[16]

Insight and understanding have increased with the years, though the springs of crime remain in large part unknown. But our own Federal Bureau of Investigation teaches that brains, not muscle, solve crimes. Coerced confessions are not only offensive to civilized standards but not responsive to the modern needs of criminal investigation. Psychiatry has shown that blind faith in rightness and wrongness is no reliable measure of human

---

[15] See 4 W. Blackstone, Commentaries *347–349. Ordeal by battle was finally abolished in 1819 in England. 59 Geo. 3, c. 46.

[16] 1 J. Stephen, History of the Criminal Law of England 467 (1883).

responsibility. The convergence of new technology for criminal investigation and of new insight into mental disorders has made many ancient legal procedures seem utterly unfair.

Who today would say it was not "cruel and unusual punishment" within the meaning of the Eighth Amendment to impose the death sentence on a man who stole a loaf of bread, or in modern parlance, a sheet of food stamps? Who today would say that trial by battle satisfies the requirements of procedural due process?

We need not read procedural due process as designed to satisfy man's deep-seated sadistic instincts. We need not in deference to those sadistic instincts say we are bound by history from defining procedural due process so as to deny men fair trials. Yet that is what the Court does today. The whole evolution of procedural due process has been in the direction of insisting on fair procedures. As the Court said in *Hebert* v. *Louisiana*, 272 U. S. 312, 316–317:

> "[S]tate action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.' Those principles are applicable alike in all the States and do not depend upon or vary with local legislation."

One basic application of that test was made in *Moore* v. *Dempsey,* 261 U. S. 86, 91:

> "[I]f the case is that the whole proceeding is a mask—that counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion, and that the State Courts failed to correct the wrong, neither perfection in the machinery for correction nor the possibility that the trial court and

counsel saw no other way of avoiding an immediate outbreak of the mob can prevent this Court from securing to the petitioners their constitutional rights."

To allow a defendant in a state trial to be convicted by confessions "extorted by officers of the State by brutality and violence" was said by Mr. Chief Justice Hughes to be "revolting to the sense of justice" and "a clear denial of due process." *Brown* v. *Mississippi,* 297 U. S. 278, 286.

In 1884 the Court in *Hurtado* v. *California,* 110 U. S. 516, 529, said that due process was not frozen in content as of one point of time: "[T]o hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians."

The Court went on to point out that though due process has its roots in Magna Carta, the latter contained words that changed with meaning as the centuries passed. *Ibid.* The Court noted that "[t]his flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." *Id.,* at 530. And it went on to say that the generalities of our Constitution should be treated in the same way:

"The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. . . . There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every

age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms." *Id.,* at 530–531.

The Court pointed out that in England Magna Carta served merely as a restraint on the executive and as a guide to the House of Commons, the keeper of the Constitution. In this Nation, however, the Constitution serves a different function.

"It necessarily happened, therefore, that as these broad and general maxims of liberty and justice held in our system a different place and performed a different function from their position and office in English constitutional history and law, they would receive and justify a corresponding and more comprehensive interpretation. Applied in England only as guards against executive usurpation and tyranny, here they have become bulwarks also against arbitrary legislation; but, in that application, as it would be incongruous to measure and restrict them by the ancient customary English law, they must be held to guarantee not particular forms of procedure, but the very substance of individual rights to life, liberty, and property." *Id.,* at 532.

In more recent times the issue was forcefully stated by MR. JUSTICE BLACK in *Chambers* v. *Florida,* 309 U. S. 227, 236–237:

"Tyrannical governments had immemorially utilized dictatorial criminal procedure and punishment to make scapegoats of the weak, or of helpless political, religious, or racial minorities and those who differed,

who would not conform and who resisted tyranny. . . . [A] liberty loving people won the principle that criminal punishments could not be inflicted save for that which proper legislative action had already by 'the law of the land' forbidden when done. But even more was needed. From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the 'law of the land' evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty,' wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed."

That is all that is involved in this case. It is a mystery how in this day and age a unitary trial that requires an accused to give up one constitutional guarantee to save another constitutional guarantee can be brought within the rubric of procedural due process. It can be done only by a *tour de force* by a majority that stops the growth and evolution of procedural due process at a wholly arbitrary line or harkens to the passions of men. What a great regression it is when the end result is to approve a procedure that makes the killing of people charged with crime turn on the whim or caprice of one man or of 12!

By standards of a fair trial, the resolution of the question of punishment requires rules and procedures different from those pertaining to guilt. Mr. Justice

Butler, speaking for the Court in *Pennsylvania* v. *Ashe*, 302 U. S. 51, 55, said:

"For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him."

Justice [17]—in the sense of procedural due process—is denied where a State makes inadmissible evidence designed to educate the jury on the character and propensities of the accused. Ohio does just that.

We noted in *Williams* v. *New York*, 337 U. S. 241, 249–252, that the States have leeway in making available to judges probation reports "to guide them in the intelligent imposition of sentences" without submitting those reports to open court testimony with cross-examination. We said, "The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure." *Id.*, at 251. But so far as I can ascertain we never have intimated that a State can, consistently with procedural due process, close the door to evidence relevant to the "intelligent imposition of sentences" either by

---

[17] It is commonly overlooked that justice is one of the goals of our people as expressed in the Preamble of the Constitution:

"We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America."

judges or by juries. Cf. *Specht* v. *Patterson, supra*, at 608–609.

It is indeed too late to say that, absent a constitutional amendment, procedural due process has no applicability to the determination of the sentence which is imposed. In *Townsend* v. *Burke, supra*, at 741, we held a state sentence imposed "on the basis of assumptions" concerning the defendant's criminal record "which were materially untrue" was "inconsistent with due process of law" whether the result was caused by "carelessness or design." *A fortiori* it would seem to follow that a procedure, which is designed to bar an opportunity to present evidence showing why "mercy" should be extended to an accused in a death case, lacks that fairness which is implicit in due process.

The unitary trial is certainly not "mercy" oriented. That is, however, not its defect. It has a constitutional infirmity because it is not neutral on the awesome issue of capital punishment. The rules are stacked in favor of death. It is one thing if the legislature decides that the death penalty attaches to defined crimes. It is quite another to leave to judge or jury the discretion to sentence an accused to death or to show mercy under procedures that make the trial death oriented. Then the law becomes a mere pretense, lacking the procedural integrity that would likely result in a fair resolution of the issues. In Ohio, the deficiency in the procedure is compounded by the unreviewability of the failure to grant mercy.[18]

We stated in *Witherspoon* v. *Illinois,* 391 U. S. 510, 521, that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." In that case veniremen had been excluded from a jury for cause "simply because

---

[18] *Hoppe* v. *State,* 29 Ohio App. 467, 163 N. E. 715.

they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.*, at 522. We concluded that no defendant "can constitutionally be put to death at the hands of a tribunal so selected." *Id.*, at 522–523.

The tribunal selected by Ohio to choose between death and life imprisoment in first-degree murder cases is not palpably "organized to return a verdict of death" in the *Witherspoon* sense. But the rules governing and restricting its administration of the unitary trial system, place the weights on the side of man's sadistic drive. The exclusion of evidence relevant to the issue of "mercy" is conspicuous proof of that lopsided procedure; and the hazards to an accused resulting from mingling the issues of guilt, insanity, and punishment in one unitary proceeding are multiplied. Whether this procedure would satisfy due process when dealing with lesser offenses may be debated. But with all deference I see no grounds for debate where the stake is life itself.

I would reverse this judgment of conviction.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

These cases test the viability of principles whose roots draw strength from the very core of the Due Process Clause. The question that petitioners present for our decision is whether the rule of law, basic to our society and binding upon the States by virtue of the Due Process Clause of the Fourteenth Amendment, is fundamentally inconsistent with capital sentencing procedures that are purposely constructed to allow the maximum possible variation from one case to the next, and provide no mechanism to prevent that consciously maximized variation from reflecting merely random or arbitrary choice. The Court does not, however, come to grips with that fundamental question. Instead, the Court misappre-

hends petitioners' argument and deals with the cases as if petitioners contend that due process requires capital sentencing to be carried out under predetermined standards so precise as to be capable of purely mechanical application, entirely eliminating any vestiges of flexibility or discretion in their use. This misapprehended question is then treated in the context of the Court's assumption that the legislatures of Ohio and California are incompetent to express with clarity the bases upon which they have determined that some persons guilty of some crimes should be killed, while others should live—an assumption that, significantly, finds no support in the arguments made by those States in these cases. With the issue so polarized, the Court is led to conclude that the rule of law and the power of the States to kill are in irreconcilable conflict. This conflict the Court resolves in favor of the States' power to kill.

In my view the Court errs at all points from its premises to its conclusions. Unlike the Court, I do not believe that the legislatures of the 50 States are so devoid of wisdom and the power of rational thought that they are unable to face the problem of capital punishment directly, and to determine for themselves the criteria under which convicted capital felons should be chosen to live or die. We are thus not, in my view, faced by the dilemma perceived by the Court, for cases in this Court have for almost a century and a half approved a multiplicity of imaginative procedures designed by the state and federal legislatures to assure evenhanded treatment and ultimate legislative control regarding matters that the legislatures have deemed either too complex or otherwise inapposite for regulation under predetermined rules capable of automatic application in every case. Finally, even if I shared the Court's view that the rule of law and the power of the States to kill are in irreconcilable

conflict, I would have no hesitation in concluding that the rule of law must prevail.

Except where it incorporates specific substantive constitutional guarantees against state infringement, the Due Process Clause of the Fourteenth Amendment does not limit the power of the States to choose among competing social and economic theories in the ordering of life within their respective jurisdictions. But it does require that, if state power is to be exerted, these choices must be made by a responsible organ of state government. For if they are not, the very best that may be hoped for is that state power will be exercised, not upon the basis of any social choice made by the people of the State, but instead merely on the basis of social choices made at the whim of the particular state official wielding the power. If there is no effective supervision of this process to insure consistency of decision, it can amount to nothing more than government by whim. But ours has been "termed a government of laws, and not of men." *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803). Government by whim is the very antithesis of due process.

It is not a mere historical accident that "[t]he history of liberty has largely been the history of observance of procedural safeguards." *McNabb* v. *United States,* 318 U. S. 332, 347 (1943) (Frankfurter, J.). The range of permissible state choice among competing social and economic theories is so broad that almost any arbitrary or otherwise impermissible discrimination among individuals may mask itself as nothing more than such a permissible exercise of choice unless procedures are devised which adequately insure that the relevant choice is actually made. Such procedures may take a variety of forms. The decisionmaker may be provided with a set of guidelines to apply in rendering judgment. His decision may be required to rest upon the presence or absence

of specific factors. If the legislature concludes that the range of variation to be dealt with precludes adequate treatment under inflexible, predetermined standards it may adopt more imaginative procedures. The specificity of standards may be relaxed, directing the decisionmaker's attention to the basic policy determinations underlying the statute without binding his action with regard to matters of important but unforeseen detail. He may be instructed to consider a list of factors—either illustrative or exhaustive—intended to illuminate the question presented without setting a fixed balance. The process may draw upon the genius of the common law, and direct itself toward the refinement of understanding through case-by-case development. In such cases decision may be left almost entirely in the hands of the body to which it is delegated, with ultimate legislative supervision on questions of basic policy afforded by requiring the decisionmakers to explain their actions, and evenhanded treatment enhanced by requiring disputed factual issues to be resolved and providing for some form of subsequent review. Creative legislatures may devise yet other procedures. Depending upon the nature and importance of the issues to be decided, the kind of tribunal rendering judgment, the number and frequency of decisions to be made, and the number of separate tribunals involved in the process, these techniques may be applied singly or in combination.

It is of critical importance in the present cases to emphasize that we are not called upon to determine the adequacy or inadequacy of any particular legislative procedure designed to give rationality to the capital sentencing process. For the plain fact is that the legislatures of California and Ohio, whence come these cases, have sought no solution at all. We are not presented with a State's attempt to provide standards, attacked as

impermissible or inadequate. We are not presented with a legislative attempt to draw wisdom from experience through a process looking toward growth in understanding through the accumulation of a variety of experiences. We are not presented with the slightest attempt to bring the power of reason to bear on the considerations relevant to capital sentencing. We are faced with nothing more than stark legislative abdication. Not once in the history of this Court, until today, have we sustained against a due process challenge such an unguided, unbridled, unreviewable exercise of naked power. Almost a century ago, we found an almost identical California procedure constitutionally inadequate to license a laundry. *Yick Wo* v. *Hopkins,* 118 U. S. 356, 366–367, 369–370 (1886). Today we hold it adequate to license a life. I would reverse petitioners' sentences of death.

## I

"Our scheme of ordered liberty is based, like the common law, on enlightened and uniformly applied legal principle, not on *ad hoc* notions of what is right or wrong in a particular case." J. Harlan, Thoughts at a Dedication: Keeping the Judicial Function in Balance, in The Evolution of a Judicial Philosophy 289, 291–292 (D. Shapiro ed., 1969).[1] The dangers inherent in any grant of governmental power without procedural safeguards upon its exercise were known to English law long long before the Constitution was established. See, *e. g.,* 8 How. St. Tr. 55–58, n. The principle that our Government shall be of laws and not of men is so strongly woven into our constitutional fabric that it has found recognition in not just one but several provisions of the

---

[1] My Brother HARLAN continues: "The stability and flexibility that our constitutional system at once possesses is largely due to our having carried over into constitutional adjudication the common-law approach to legal development." *Id.,* at 292.

Constitution.[2]   And this principle has been central to the decisions of this Court giving content to the Due Process Clause.[3]   As we said in *Hurtado* v. *California*, 110 U. S. 516, 535–536 (1884):

"[I]t is not to be supposed that . . . the amendment prescribing due process of law is too vague and

[2] The prohibition against bills of attainder, Art. I, § 9, cl. 3 (federal), § 10, cl. 1 (state), protects individuals or groups against being singled out for legislative instead of judicial trial.   See *United States* v. *Brown*, 381 U. S. 437, 442–446 (1965); *id.*, at 462 (dissent); *Cummings* v. *Missouri*, 4 Wall. 277, 322–325 (1867).   The prohibition against *ex post facto* laws, joined in the Constitution to the ban on bills of attainder, prevents legislatures from achieving similar ends by indirection, either by making criminal acts that were innocent when performed, *Cummings* v. *Missouri, supra*, at 325–326; *Calder* v. *Bull*, 3 Dall. 386, 390 (1798) (Chase, J.), or by increasing the punishment imposed upon admittedly criminal acts that have already been committed.   *In re Medley*, 134 U. S. 160, 166–173 (1890); *Calder* v. *Bull, supra*.   The constitutional limitation of federal legislative power to the Congress has been applied to require that fundamental policy choices be made, not by private individuals— or even public officers—acting pursuant to an unguided and unsupervised delegation of legislative authority, but by the Nation as a whole acting through Congress.   See, *e. g., FCC* v. *RCA Communications, Inc.*, 346 U. S. 86, 90 (1953); *Lichter* v. *United States*, 334 U. S. 742, 766, 769–773, 778 (1948); *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 529–530, 537–539 (1935); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 414–430 (1935); *id.*, at 434, 435 (Cardozo, J., dissenting).   Finally, the requirement of evenhanded treatment imposed upon the States and their agents by the Equal Protection Clause, see *Cooper* v. *Aaron*, 358 U. S. 1, 16–17 (1958); *McFarland* v. *American Sugar Co.*, 241 U. S. 79, 86–87 (1916) (Holmes, J.), has been applied to the Federal Government as well through the Fifth Amendment's Due Process Clause.   *E. g., Shapiro* v. *Thompson*, 394 U. S. 618, 641–642 (1969); *Schneider* v. *Rusk*, 377 U. S. 163, 168–169 (1964); *Bolling* v. *Sharpe*, 347 U. S. 497 (1954).

[3] Thus, although recognizing that the explicit constitutional prohibition against *ex post facto* laws applies only to legislative action, we held in *Bouie* v. *City of Columbia*, 378 U. S. 347, 353–354 (1964),

indefinite to operate as a practical restraint. . . . Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but . . . 'the general law . . .' so 'that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society,' and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation . . . and other similar special, partial and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude."

The principal function of the Due Process Clause is to insure that state power is exercised only pursuant to procedures adequate to vindicate individual rights.[4]

---

that due process was violated by like action on the part of a state court. Significantly, the dissenting Justices in *Bowie* took issue only with the Court's conclusion that the interpretation of the statute in question by the State Supreme Court was not foreshadowed by prior state law. See *id.*, at 366–367. Similarly, although we have held the States not bound, as is the Federal Government, by the doctrine of separation of powers, *Dreyer* v. *Illinois*, 187 U. S. 71, 83–84 (1902); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 255 (1957), we have nevertheless held that state delegation of legislative authority without guideline or check violates due process. *Seattle Trust Co.* v. *Roberge*, 278 U. S. 116, 120–122 (1928); *Eubank* v. *Richmond*, 226 U. S. 137, 143–144 (1912); cf. *Browning* v. *Hooper*, 269 U. S. 396, 405–406 (1926). See the discussion *infra*, at 271–273. Finally, in *Hurtado* v. *California*, 110 U. S. 516, 535–536 (1884), quoted in the text immediately above, we noted as an example of a clear violation of due process the passage by a legislature of a bill of attainder. Cf. n. 2, *supra*, and cases cited.

[4] We have, of course, applied specific substantive protections of the Bill of Rights to limit state power under the Due Process Clause. *E. g.*, *Near* v. *Minnesota*, 283 U. S. 697 (1931) (First Amendment);

While we have, on rare occasions, held that due process requires specific procedural devices not explicitly commanded by the Bill of Rights,[5] we have generally either indicated one acceptable procedure and left the States free to devise others,[6] or else merely ruled upon the validity or invalidity of a particular procedure without attempting to limit or even guide state choice of procedural mechanisms beyond stating the obvious proposition that inadequate mechanisms may not be employed.[7] Several principles, however, have until today been consistently employed to guide determinations of the adequacy of any given state procedure. "When the Government exacts . . . much, the importance of fair, even-

---

*Robinson* v. *California,* 370 U. S. 660 (1962) (Eighth Amendment); *Griswold* v. *Connecticut,* 381 U. S. 479, 481–486 (1965) (First, Third, Fourth, Fifth, and Ninth Amendments). Conversely, we have held at least some aspects of the Fourteenth Amendment's Equal Protection Clause applicable to limit federal power under the Due Process Clause of the Fifth Amendment. See *Shapiro* v. *Thompson,* 394 U. S., at 641–642, and cases cited. Finally, we have, of course, held that due process forbids a State from punishing the assertion of federally guaranteed rights whether procedural or otherwise. *North Carolina* v. *Pearce,* 395 U. S. 711, 723–725 (1969); *Spevack* v. *Klein,* 385 U. S. 511 (1967); cf. *Ex parte Hull,* 312 U. S. 546 (1941). But we have long rejected the view, typified by, *e. g., Adkins* v. *Children's Hospital,* 261 U. S. 525 (1923), overruled in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (1937), that the Due Process Clause vests judges with a roving commission to impose their own notions of wise social policy upon the States. *Ferguson* v. *Skrupa,* 372 U. S. 726, 730–731 (1963).

[5] *E. g., North Carolina* v. *Pearce, supra,* at 725–726 (1969); *Boykin* v. *Alabama,* 395 U. S. 238, 242–244 (1969); see also *Goldberg* v. *Kelly,* 397 U. S. 254, 269–271 (1970).

[6] *E. g., United States* v. *Wade,* 388 U. S. 218, 236–239 (1967); *Miranda* v. *Arizona,* 384 U. S. 436, 467–473 (1966); *Jackson* v. *Denno,* 378 U. S. 368, 377–391 (1964).

[7] *E. g., Johnson* v. *Avery,* 393 U. S. 483, 488–490 (1969); *In re Murchison,* 349 U. S. 133 (1955); *Seattle Trust Co.* v. *Roberge, supra.*

handed, and uniform decisionmaking is obviously intensified." *Gillette* v. *United States,* 401 U. S. 437, 455 (1971). Procedures adequate to determine a welfare claim may not suffice to try a felony charge. Compare *Goldberg* v. *Kelly,* 397 U. S. 254, 270–271 (1970), with *Gideon* v. *Wainwright,* 372 U. S. 335 (1963). Second, even where the only rights to be adjudicated are those created and protected by state law, due process requires that state procedures be adequate to allow all those concerned a fair hearing of their state-law claims. *Boddie* v. *Connecticut,* 401 U. S. 371 (1971); *Covey* v. *Town of Somers,* 351 U. S. 141 (1956); *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306 (1950). Third, where federally protected rights are involved, due process commands not only that state procedure be adequate to assure a fair hearing of federal claims, *In re Gault,* 387 U. S. 1 (1967), but also that it provide adequate opportunity for review of those federal claims where such review is otherwise available. *Goldberg* v. *Kelly,* 397 U. S., at 271; *Boykin* v. *Alabama,* 395 U. S. 238, 242–244 (1969); *Jackson* v. *Denno,* 378 U. S. 368, 387 (1964); cf. *North Carolina* v. *Pearce,* 395 U. S. 711, 725–726 (1969); *In re Murchison,* 349 U. S. 133, 136 (1955). Finally, and closely related to the previous point, due process requires that procedures for the exercise of state power be structured in such a way that, ultimately at least, fundamental choices among competing state policies are resolved by a responsible organ of state government. *Louisiana* v. *United States,* 380 U. S. 145, 152–153 (1965) (BLACK, J.); *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86, 90 (1953); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *United States* v. *Rock Royal Co-op,* 307 U. S. 533, 574, 575 (1939); *Currin* v. *Wallace,* 306 U. S. 1, 15 (1939); *Lovell* v. *Griffin,* 303 U. S. 444 (1938); *Browning* v. *Hooper,* 269 U. S. 396, 405–406 (1926); *McKinley* v. *United States,* 249 U. S. 397, 399 (1919); *Eubank* v.

*Richmond,* 226 U. S. 137, 143–144 (1912); *Yick Wo* v. *Hopkins,* 118 U. S., at 366–367, 369–370. The damage that today's holding, if followed, would do to our constitutional fabric can only be understood from a closer examination of our cases than is contained in the Court's opinion. I therefore turn to those cases.

## A

Analysis may usefully begin with this Court's cases applying what has come to be known as the "void-for-vagueness" doctrine. It is sometimes suggested that in holding a statute void for vagueness, this Court is merely applying one of two separate doctrines: first, that a criminal statute must give fair notice of the conduct that it forbids, *e. g., Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939); *Connally* v. *General Construction Co.,* 269 U. S. 385, 391 (1926); and second, that a statute may not constitutionally be enforced if it indiscriminately sweeps within its ambit conduct that may not be the subject of criminal sanctions as well as conduct that may. *E. g., Baggett* v. *Bullitt,* 377 U. S. 360 (1964); *Dombrowski* v. *Pfister,* 380 U. S. 479, 492–496 (1965). To this is often added the observation that both doctrines apply with particular vigor to state regulation of conduct at or near the boundaries of the First Amendment. See *United States* v. *National Dairy Corp.,* 372 U. S. 29, 36 (1963); *Smith* v. *California,* 361 U. S. 147, 150–152 (1959).[8] But unless it be assumed that our decisions in such matters have shown an almost unparalleled inconsistency, these factors may not be taken as more than a partial explanation of the doctrine.

---

[8] For analysis in substantially these terms, see, *e. g.,* Collings, Unconstitutional Uncertainty—An Appraisal, 40 Cornell L. Q. 195 (1955); Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533 (1951); Comment, 53 Mich. L. Rev. 264 (1954).

To begin with, we have never treated claims of unconstitutional statutory vagueness in terms of the statute as written or as construed prior to the time of the conduct in question. Instead, we have invariably dealt with the statute as glossed by the courts below at the time of decision here. *E. g., Giaccio* v. *Pennsylvania,* 382 U. S. 399 (1966); *Winters* v. *New York,* 333 U. S. 507 (1948); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941). In *Musser* v. *Utah,* 333 U. S. 95 (1948), we even remanded a criminal case to the Utah Supreme Court for a construction of the statute so that its possible vagueness could be analyzed. In dealing with vagueness attacks on federal statutes, we have not hesitated to construe the statute to avoid vagueness problems and, having so construed it, apply it to the case at hand. See *United States* v. *Vuitch, ante,* p. 62 (1971); *Dennis* v. *United States,* 341 U. S. 494, 502 (1951); *Kay* v. *United States,* 303 U. S. 1 (1938). If the vagueness doctrine were fundamentally premised upon a concept of fair notice, such treatment would simply make no sense: a citizen cannot be expected to foresee subsequent construction of a statute by this or any other court. See Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 540–542 (1951). But if, as I believe, the doctrine of vagueness is premised upon the fundamental notion that due process requires governments to make explicit their choices among competing social policies, see *infra,* at 259–265, the inconsistency between theory and practice disappears. Of course such a choice, once made, is not irrevocable: statutes may be amended and statutory construction overruled. Nevertheless, an explicit state choice among possible statutory constructions substantially reduces the likelihood that subsequent convictions under the statute will be based on impermissible

factors.[9]  It also renders more effective the available mechanisms for judicial review, by increasing the likelihood that impermissible factors, if relied upon, will be discernible from the record.   Thus in *Thompson* v. *Louisville,* 362 U. S. 199 (1960), we were faced with the application of a specific vagrancy statute to conduct—dancing in a public bar—that there is no reason to believe could not have been constitutionally prohibited had the State chosen to do so.   We were, however, able to examine the record and conclude that there was in fact no evidence that could support a conviction under the statute.   Cf. *Bachellar* v. *Maryland,* 397 U. S. 564 (1970) (impossible to determine whether verdict rested upon permissible or impermissible grounds).

Second, in dealing with statutes that are unconstitutionally overbroad, we have consistently indicated that "once an acceptable limiting construction is obtained, [such a statute] may be applied to conduct occurring prior to the construction, provided such application affords fair warning to the defendants." *Dombrowski* v. *Pfister,* 380 U. S., at 491 n. 7 (citations omitted);[10] see, *e. g., Poulos* v. *New Hampshire,* 345 U. S. 395 (1953).   That is, an unconstitutionally overbroad statute may not be enforced *at all* until an acceptable construction has been obtained, *e. g., Thornhill* v. *Alabama,*

---

[9] A vague statute may be applied one way to one person and a different way to another.   Aside from the fact that this in itself would constitute a denial of equal protection, *Niemotko* v. *Maryland,* 340 U. S. 268, 272 (1951), cf. H. Black, A Constitutional Faith 31–32 (1969), the reasons underlying different applications to different individuals may in themselves be constitutionally impermissible.   Cf. *Schacht* v. *United States,* 398 U. S. 58 (1970) (applicability of statute determined by political views); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886) (application of statute on racial basis).

[10] *Younger* v. *Harris,* 401 U. S. 37 (1971), and its companions cast no shadow upon the sentence quoted.

310 U. S. 88 (1940); but once such a construction has been made, the statute as construed may be applied to conduct occurring prior to the limiting construction. If notice and overbreadth were the only components of the vagueness doctrine, this treatment would, once again, be inexplicable. So far as notice is concerned, one who has engaged in certain conduct prior to the limiting construction of an overbroad statute has obviously not received from that construction any warning that would have enabled him to keep his conduct within the bounds of law. Similarly, if adequate notice has in fact been given by an overbroad statute that certain conduct was criminally punishable, it is hard to see how the doctrine of overbreadth is furthered by forbidding the State, on the one hand, to punish that conduct so long as an acceptable limiting construction has not been obtained, but permitting it to punish the same, prior conduct once the statute has been acceptably construed. Once again, however, our actions are not at all inexplicable if examined in the terms articulated here. Once an acceptable limiting construction has in fact been obtained, there is by that very fact an assurance that a responsible organ of state power has made an explicit choice among possible alternative policies: for it should not be forgotten that the States possess constitutional *power* to make criminal much conduct that they may not wish to forbid, or may even desire to encourage. If a vague or overbroad statute is applied before it has been acceptably construed, there remains the danger that an individual whose conduct is admittedly clearly within the scope of the statute on its face will be punished for actions which in fact the State does not desire to make generally punishable—conduct which, if engaged in by another person, would not be subject to criminal liability. *Shuttlesworth* v. *Birmingham,* 382 U. S. 87, 91–92 (1965). Allowing a vague or overbroad statute to be enforced if, and only if, an acceptable con-

struction has been obtained forces the State to make explicit its social choices and prevents discrimination through the application of one policy to one person and another policy to others.[11]

---

[11] A closely related proposition may be derived from a separate line of cases. In *Louisiana Power & Light Co.* v. *City of Thibodaux*, 360 U. S. 25 (1959), we upheld abstention by a federal district court in a diversity action from decision whether, under a state statute never construed by the Louisiana courts, cities in the State possessed the power to take local gas and electric companies by eminent domain. The same day, in *Allegheny County* v. *Frank Mashuda Co.*, 360 U. S. 185 (1959), we upheld the action of another district court in refusing to abstain from decision whether, under state law allowing takings for public but not for private use, Allegheny County possessed the power to take a particular property for a particular use. Are the decisions irreconcilable? As we have often remarked, the basis of diversity jurisdiction is "the supposition that, possibly, the state tribunal[s] might not be impartial between their own citizens and foreigners." *Pease* v. *Peck*, 18 How. 595, 599 (1856). The question of state law presented in *Thibodaux* was a broad one having substantial ramifications beyond the lawsuit at hand. Any prejudice against the out-of-state company involved in that case could have been given effect in state courts only at the cost of a possibly incorrect decision that would have significant adverse effect upon state citizens as well as the particular outsider involved in the suit. In *Mashuda,* on the other hand, decision one way or another would have little or no effect beyond the case in question: any possible state bias against out-of-Staters could be given full effect without hampering any significant state policy. Taken together, then, *Thibodaux* and *Mashuda* may stand for the proposition that the possibility of bias that stands at the foundation of federal diversity jurisdiction may nevertheless be discounted if that bias could be given effect only through a decision that will have inevitable repercussions on a matter of fundamental state policy. Put another way, *Thibodaux* and *Mashuda* may serve to illustrate in another context the principle that necessarily underlies many of this Court's "vagueness" decisions: the due process requirement that States make explicit their choice among competing views on questions of fundamental state policy serves to enforce the requirement of evenhanded treatment that due process commands.

Particularly relevant to the present case is our decision in *Giaccio* v. *Pennsylvania,* 382 U. S. 399 (1966). That case involved a statute whereby Pennsylvania attempted to mitigate the harshness of its common-law rule requiring criminal defendants to pay the costs of prosecution in all cases [12] by committing the matter to the discretion of the jury in cases where the defendant was found not guilty.[13] Two members of this Court, concurring in the result, would have held that due process forbade the imposition of costs upon an acquitted defendant. 382 U. S., at 405. We refused, however, to base our decision on that ground. In an opinion by my Brother BLACK, we said:

> "We agree with the trial court . . . that the 1860 Act is invalid under the Due Process Clause because of vagueness and the *absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory impositions of costs.*
>
> .     .     .     .     .
>
> ". . . It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or *leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.* This 1860 Pennsylvania Act contains no standards at all . . . . Certainly one of the basic purposes of the Due Process Clause has always been to protect a person against having the

---

[12] See Brief for Appellee in *Giaccio,* No. 47, O. T. 1965, pp. 8–10; *Commonwealth* v. *Tilghman,* 4 S. & R. 127 (Pa. Sup. Ct. 1818); Act of March 20, 1797, 3 Smith's Laws 281 (Pa.).

[13] Some standards were provided to guide the jury's decision. See 382 U. S., at 403–404. See App. 30–32 in *Giaccio* for the charge given in that case.

Government impose burdens upon him except in accordance with the valid laws of the land. Implicit in this constitutional safeguard is the premise that *the law must be one that carries an understandable meaning with legal standards that courts must enforce. . . .*

". . . The State contends that . . . state court interpretations have provided standards and guides that cure the . . . constitutional deficiencies. We do not agree. . . . In this case the trial judge instructed the jury that it might place the costs of prosecution on the appellant, though found not guilty of the crime charged, if the jury found that 'he has been guilty of some misconduct less than the offense which is charged but nevertheless misconduct of some kind as a result of which he should be required to pay some penalty short of conviction [and] . . . his misconduct has given rise to the prosecution.'

"It may possibly be that the trial court's charge comes nearer to *giving a guide to the jury* than those that preceded it, but it still falls short of the kind of legal standard due process requires. . . ." 382 U. S., at 402–404 (emphasis added) (citations omitted).[14]

Several features of *Giaccio* are especially pertinent in the present context. First, there were no First Amendment implications in either the conduct charged or that in which Giaccio claimed to have engaged: the State's evidence was to the effect that Giaccio had wantonly discharged a firearm at another, in violation of Pa. Stat.

---

[14] We did in *Giaccio* say that "we intend to cast no doubt whatever on the constitutionality of the settled practice of many States" prescribing jury sentencing. 382 U. S., at 405 n. 8. Insofar as jury sentencing *in general* is concerned, *Giaccio* is by no means necessarily inconsistent with the practice. See *infra,* at 311.

Ann., Tit. 18, § 4716 (1963), and Giaccio's defense was that "the firearm he had discharged was a starter pistol which only fired blanks." 382 U. S., at 400. Second, we were not presented with a defendant who had been convicted for conduct he could not have known was unlawful. Whether or not Giaccio's actions fell within § 4716, his conduct was unquestionably punishable under other state laws, *e. g.,* Pa. Stat. Ann., Tit. 18, § 4406 (1963). Finally, it is worthy of note that in *Giaccio* two members of this Court explicitly sought to base the result upon the ground that, as a matter of substantive due process, the States were forbidden to impose the costs of prosecution upon an acquitted defendant. 382 U. S., at 405 (concurring opinions of STEWART and Fortas, JJ.). Yet we refused to place decision on any such ground. We held instead, consistently with our prior decisions, that the procedure for determining Giaccio's punishment lacked the safeguards against arbitrary action that are required by due process of law.[15]

---

[15] I find little short of bewildering the Court's treatment of *Giaccio.* The Court appears to read that case as standing for the proposition that due process forbids a jury to impose punishment upon defendants for conduct which, "although not amounting to the crime with which they were charged, was nevertheless found to be 'reprehensible.' " *Ante,* at 207 n. 18. Of course, the procedures under review permit precisely the same action, without providing even the minimal safeguards found insufficient in *Giaccio.* See Part III, *infra.* If there is a difference between *Giaccio* and the present cases, it is that the procedures now under review apply, not to acquitted defendants, but only to those who have already been found guilty of some crime. But the Court elsewhere in its opinion has concluded that the "relevant differences between sentencing and determination of guilt or innocence are not so great as to call for a difference in constitutional result." *Ante,* at 217. I think it is fair to say that nowhere in its treatment of *Giaccio* does the Court even attempt to explain why the unspecified "relevant differences" that it finds *do* call for "a difference in constitutional result."

Our decisions applying the Due Process Clause through the doctrine of unconstitutional vagueness, then, lead to the following conclusions. First, the protection against arbitrary and discriminatory action embodied in the Due Process Clause requires that state power be exerted only through mechanisms that assure that fundamental choices among competing state policies be explicitly made by some responsible organ of the State.[16] Second, the cases suggest that due process requires as well that state procedures for decision of questions that may have adverse consequences for an individual neither leave room for the deprivation *sub silentio* of the individual's federally protected rights nor unduly frustrate the federal judicial review provided for the vindication of those rights. This second point is explicitly made in a not unrelated line of cases, to which I now turn.

---

[16] This same point may be made another way. We have consistently held that the Due Process Clause protects individuals against arbitrary governmental action. Despite sharp conflict among the members of this Court over the standards to be applied in determining whether governmental action is in fact "arbitrary," see, *e. g., Griswold* v. *Connecticut,* 381 U. S. 479, 499 (1965) (HARLAN, J., concurring in judgment); *id.,* at 507 (BLACK, J., dissenting), all members of this Court have agreed that the phrase has some content. *E. g., Giaccio* v. *Pennsylvania,* 382 U. S., at 402 (BLACK, J.) (due process requires defendants to be protected "against arbitrary and discriminatory" punishment). Our vagueness cases suggest that state action is arbitrary and therefore violative of due process not only if it is (a) based upon distinctions which the State is specifically forbidden to make, *e. g., Loving* v. *Virginia,* 388 U. S. 1, 12 (1967); or (b) designed to, or has the effect of, punishing an individual for the assertion of federally protected rights, *e. g., North Carolina* v. *Pearce,* 395 U. S. 711, 723–725 (1969); *id.,* at 739 (BLACK, J.), but also if it is (c) based upon a permissible state policy choice which could be, but has never been, explicitly made by any responsible organ of the State.

## B

Whether through its own force or only through the application of other, specific constitutional guarantees, the Due Process Clause of the Fourteenth Amendment protects individuals from a narrow class of impermissible exertions of power by the States. As applied to the procedures whereby admittedly permissible state power is exerted, however, the Due Process Clause has consistently been given a wider scope. "[O]ur system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U. S. 133, 136 (1955). Thus, we have never suggested that every judge who has been the target of contemptuous, personal attacks by litigants or their attorneys is *incapable* of rendering a fair decision on the merits of a contempt charge against such persons; but we have consistently held that, excepting only cases of urgent necessity, due process requires that contempt charges in such cases be heard by a different judge. *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971); *In re Murchison, supra.* And in *Tumey* v. *Ohio,* 273 U. S. 510 (1927), we did not suggest that every judgment rendered by an official who had a financial stake in the outcome was *ipso facto* the product of bias. Proceeding from a directly contrary assumption,[17] we nevertheless held that due process was violated by any "procedure which would offer a possible temptation to the average man . . . not to hold the balance nice, clear and true between the State and the accused." *Id.,* at 532. In *Jackson* v. *Denno,* 378 U. S. 368 (1964), one of the two grounds on which we struck down a New York procedure that required a jury to determine the

---

[17] "There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it . . . ." 273 U. S., at 532.

voluntariness of a confession at the same time that it determined his guilt of the crime charged was that the procedure created an impermissible—and virtually unreviewable—risk that the jury would not be able to disregard a confession that it felt was both involuntary and true. *Id.*, at 388–391. Similarly, in a long line of cases beginning with *Lovell* v. *Griffin*, 303 U. S. 444 (1938), we have repeatedly held that due process is violated by state procedures for the administration of permit systems regulating the public exercise of First Amendment rights if the procedure allows a permit to be denied for impermissible reasons, whether or not an individual can actually demonstrate that he was denied a permit for activity which the State could not lawfully prohibit. And only recently, in *Louisiana* v. *United States*, 380 U. S. 145 (1965), we were faced with a state procedure for determining voting qualifications that, in the State's own words, vested "discretion in the registrars of voters to determine the qualifications of applicants for registration," but imposed "no definite and objective standards upon registrars of voters for the administration of the interpretation test." *Id.*, at 152. After quoting, with apparent approval, an 1898 state criticism of a similar procedure on the ground that the "arbitrary power, lodged with the registration officer, practically places his decision beyond the pale of judicial review," *ibid.*, we noted and accepted the District Court's finding that "Louisiana . . . provides no effective method whereby arbitrary and capricious action by registrars of voters may be prevented or redressed." *Ibid.* We continued:

> "The applicant facing a registrar in Louisiana thus has been compelled to leave his voting fate to that official's uncontrolled power to determine whether the applicant's understanding of the Federal or State Constitution is satisfactory. . . . The cherished

right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar. Many of our cases have pointed out the invalidity of laws so completely devoid of standards and restraints." 380 U. S., at 152–153.

On that basis we held the Louisiana procedure for determining the qualifications of prospective voters to be a denial of due process. *Ibid.*[18]

Diverse as they are, these cases rest upon common ground. They all stand ineluctably for the proposition that due process requires more of the States than that they not exert state power in impermissible ways. Specifically, the rule of these cases is that state procedures are inadequate under the Due Process Clause unless they are designed to control arbitrary action and also to make meaningful the otherwise available mechanism for judicial review. We have elsewhere made this last point explicit. In *Specht* v. *Patterson,* 386 U. S. 605 (1967), we held that due process in commitment proceedings, "whether denominated civil or criminal," *id.,* at 608, requires "findings adequate to make meaningful any appeal that is allowed." *Id.,* at 610; see *Garner* v. *Louisiana,* 368 U. S. 157, 173 (1961). And in *Jackson* v. *Denno, supra,* the alternative ground on which we struck down a New York procedure for determining the voluntariness of a confession by submitting that question to the jury at the same time as the question of guilt was that the "admixture of reliability and voluntariness in the considerations of the jury would itself entitle a defendant to further proceedings in any case in which the essential

---

[18] We held, as an alternative ground, that the Louisiana procedure as applied had violated the Fifteenth Amendment. 380 U. S., at 152–153.

facts are disputed, for we cannot determine how the jury resolved these issues *and will not assume that they were reliably and properly resolved against the accused.*" 378 U. S., at 387 (emphasis added). In other words, due process forbids the States to adopt procedures that would defeat the institution of federal judicial review.[19]

The depth to which these principles are embedded in the concept of due process is evidenced by the fact that we have, on occasion, applied them not merely to rule that a particular state procedure is or is not permissible under the Due Process Clause, but that a particular, specific procedure is *required* by due process. We have repeatedly held, for example, that a guilty plea and its inevitably attendant waivers of federally guaranteed rights are valid only if they represent a "voluntary and intelligent choice" on the part of the defendant. *North Carolina* v. *Alford,* 400 U. S. 25, 31 (1970). The validity of a guilty plea may be tested on federal habeas corpus, where facts outside the record may be pleaded and proved. *Waley* v. *Johnston,* 316 U. S. 101 (1942). While recognizing the existence of such a remedy, we held in *Boykin* v. *Alabama,* 395 U. S. 238 (1969), that due process requires a record "adequate for any review that may be later sought," *id.,* at 244, and does not permit protection of the federally guaranteed rights to be relegated to "collateral proceedings that seek to probe murky memories." *Ibid.* Accordingly, we held that due process requires a State, in accepting a plea of guilty, to make a contemporaneous record adequate "to show that [the defendant] had intelligently and knowingly pleaded guilty." *Id.,* at 241. And only last Term, in *Goldberg*

---

[19] See also 378 U. S., at 392: "If this case were here upon direct review of Jackson's conviction, we could not proceed with review on the assumption that these disputes had been resolved in favor of the State for as we have held we are . . . unable to tell how the jury resolved these matters . . . ."

v. *Kelly,* 397 U. S. 254 (1970), we held that because a decision on the withdrawal of welfare benefits must "rest solely on the legal rules and evidence adduced at the hearing," *id.,* at 271, due process requires that the decision-maker "demonstrate compliance with this elementary requirement" by "stat[ing] the reasons for his determination and indicat[ing] the evidence he relied on." *Ibid.*

## C

In my view, the cases discussed above establish beyond peradventure the following propositions. *First,* due process of law requires the States to protect individuals against the arbitrary exercise of state power by assuring that the fundamental policy choices underlying any exercise of state power are explicitly articulated by some responsible organ of state government. *Second,* due process of law is denied by state procedural mechanisms that allow for the exercise of arbitrary power without providing any means whereby arbitrary action may be reviewed or corrected. *Third,* where federally protected rights are involved due process of law is denied by state procedures which render inefficacious the federal judicial machinery that has been established for the vindication of those rights. If there is any way in which these propositions must be qualified, it is only that in some circumstances the impossibility of certain procedures may be sufficient to permit state power to be exercised notwithstanding their absence. Cf. *Carroll* v. *President and Commissioners,* 393 U. S. 175, 182, 184–185 (1968). But the judgment that a procedural safeguard otherwise required by the Due Process Clause is impossible of application in particular circumstances is not one to be lightly made. This is all the more so when, as in the present cases, the argument of impossibility is not made by the parties before us, but only by this Court. Before we

conclude that capital sentencing is inevitably a matter of such complexity that it cannot be carried out in consonance with the fundamental requirements of due process, we should at the very least examine the mechanisms developed in not incomparable situations and previously approved by this Court. Therefore, before examining the specific capital sentencing procedures at issue in these cases in light of the Due Process Clause, I am compelled to discuss both the mechanisms available for the control of arbitrary action and the nature of the capital sentencing process.

## II

A legislature that has determined that the State should kill some but not all of the persons whom it has convicted of certain crimes must inevitably determine how the State is to distinguish those who are to be killed from those who are not. Depending ultimately on the legislature's notion of wise penological policy, that distinction may be hard or easy to make.[20] But capital sentencing is not the only difficult question with which legislatures have ever been faced. At least since *Wayman* v. *Southard,* 10 Wheat. 1 (1825), we have recognized that the Constitution does not prohibit Congress from dealing with such questions by delegating to others the responsibility for their determination. It is not my purpose to trace in detail either the sources and scope of the delegation doctrine or the extent to which it is applicable to the States through the Due Process Clause.

---

[20] It is essential to bear in mind that the complexity of capital sentencing determinations is a function of the penological policy applied. A State might conclude, for example, that murderers should be sentenced to death if and only if they had committed more than one such crime. Application of such a criterion to the facts of any particular case would then be relatively simple.

It is sufficient to state that in my view, whatever the sources of the doctrine,[21] its application to the States as a matter of due process[22] is merely a reflection of the fundamental principles of due process already discussed: in my Brother HARLAN's words, the delegation doctrine

> "insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people [and] prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged." *Arizona* v.

[21] As applied to the Federal Government, the doctrine appears to have roots both in the constitutional requirement of separation of powers—not, of course, applicable itself to the States, *Dreyer* v. *Illinois*, 187 U. S., at 83–84; *Sweezy* v. *New Hampshire*, 354 U. S., at 255—and in the Due Process Clause of the Fifth Amendment. See, *e. g.*, *Wayman* v. *Southard*, 10 Wheat. 1, 13–14 (1825) (argument of counsel) (due process and separation of powers); *Field* v. *Clark*, 143 U. S. 649, 692 (1892) (separation of powers); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 310–312 (1936) (due process). The two doctrines are not unrelated: in the words of Mr. Justice Brandeis, "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power." *Myers* v. *United States*, 272 U. S. 52, 293 (1926) (dissent).

[22] At least since *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886), we have indicated that due process places limits on the manner and extent to which a state legislature may delegate to others powers which the legislature might admittedly exercise itself. *E. g.*, *Eubank* v. *Richmond*, 226 U. S. 137 (1912); *Embree* v. *Kansas City Road District*, 240 U. S. 242 (1916); *Browning* v. *Hooper*, 269 U. S. 396 (1926); *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 457, 465 (1927); *Miller* v. *Schoene*, 276 U. S. 272 (1928); *Seattle Trust Co.* v. *Roberge*, 278 U. S. 116 (1928); *Louisiana* v. *United States*, 380 U. S. 145 (1965); *Giaccio* v. *Pennsylvania*, 382 U. S. 399 (1966). See Jaffe, Law Making by Private Groups, 51 Harv. L. Rev. 201 (1937).

*California,* 373 U. S. 546, 626 (1963) (dissenting in part).[23]

My intention here is merely to provide an admittedly brief sketch of the several mechanisms that Congress has employed to assure that even with regard to the most complex and intractable problems, delegation by Congress of the power to make law has been subject to controls that limit the possibility of arbitrary action, and that assure that Congress retains the responsibility for ultimate decision of fundamental questions of national policy. With these mechanisms in mind, I intend briefly to discuss the considerations relevant to the problem of capital sentencing with an eye to the question whether it may responsibly be said that all of these mechanisms are impossible of application by the States to the capital sentencing process.

## A

At the outset, candor compels recognition that our cases regarding the delegation by Congress of lawmaking power do not always say what they seem to mean. Kenneth Culp Davis has been instrumental in pointing out the "unreality"[24] of judicial language appearing to direct attention solely to the presence or absence of statutory "standards"[25] or an "intelligible principle"[26] by which delegated authority may be guided. See generally 1

---

[23] The passage quoted is explicitly an exegesis on the separation of powers. The point here is that, as discussed above, precisely the same functions are performed by the Due Process Clause. For a recent and original analysis to precisely the same effect, see K. Davis, Administrative Law Treatise §§ 2.00 to 2.00–6 (Supp. 1970).

[24] 1 K. Davis, Administrative Law Treatise § 2.03, at 82 (1958).

[25] *E. g., Yakus* v. *United States,* 321 U. S. 414, 423–424 (1944).

[26] The phrase is Mr. Chief Justice Taft's, from *Hampton & Co.* v. *United States,* 276 U. S. 394, 409 (1928).

K. Davis, Administrative Law Treatise §§ 2.01 to 2.05 (1958). In his words,

"The difficulty and complexity of some types of policy determination requires that the legislative body should be allowed to provide for the administrative working out of basic policy through the use of specialized tribunals which use the common-law method of concentrating upon one particular, narrow, and concrete problem at a time. The protection of advance legislative guidance is of little or no consequence as compared with the protection that can and should be provided through adequate procedural safeguards, appropriate legislative supervision or reexamination, and the accustomed scope of judicial review.

. . . . .

"The protection that comes from a hearing with a determination on the record, from specific findings and reasons, from opportunity for outside critics to compare one case with another, from critical supervision by the legislative authority . . . and from judicial review—all this is likely to be superior to protection afforded by definiteness of standards." Id., §§ 2.05, at 98–99, 2.09, at 111 (1958).[27]

---

[27] Professor Davis has just recently suggested that, insofar as it presupposes a search for legislative standards, the doctrine prohibiting undue delegation of legislative power be explicitly abandoned. "The time has come for the courts to acknowledge that the non-delegation doctrine is unsatisfactory and to invent better ways to protect against arbitrary administrative power.

"The non-delegation doctrine can and should be altered to turn it into an effective and useful judicial tool. Its purpose should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards; its purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power. The focus . . . should be on the totality of

The point made by Professor Davis has, I think, often been recognized by Congress. It is not surprising, then, to see that in many instances Congress has focused its attention much less upon the definition of precise statutory standards than on the creation of other means adequate to assure that policy is set in accordance with congressional desires and that individuals are treated according to uniform principles rather than administrative whim. Viewed in this light, our cases may be considered as illustrating at least three legislative techniques.

*First.* In a number of instances, Congress has in fact undertaken to regulate even rather complex questions by the prescription of relatively specific standards. It is certainly an open question whether determining what conduct should be subject to criminal sanctions is any more difficult than determining what those sanctions should be; yet Congress and the state legislatures as well have regularly passed criminal codes embodying, in the main, statutes directed at specifically and narrowly defined conduct.[28] Similarly, the Congress resolved what was certainly one of the most delicate and complex questions before it in recent years—the extent, if any, to which the national interest warranted federal regulation of organizations, including political parties, infiltrated by, dominated by, or subject to foreign control—not by leaving the matter to anyone else but by defining with careful particularity the characteristics that were required before

---

protections against arbitrariness, including both safeguards and standards." Administrative Law Treatise, § 2.00, at 40 (Supp. 1970). Adoption of this approach, he suggests, would cause the delegation doctrine to "merge with the concept of due process." *Id.*, § 2.00–6, at 58.

[28] Of course, where Congress has intended only to provide criminal sanctions intended to further a regulatory scheme it has often simply made criminal the willful violation of administrative regulations rather than enacting statutes outlawing specific conduct. *E. g.*, 26 U. S. C. § 7203.

an organization could be subject to such regulation. See 50 U. S. C. §§ 782 (3), (4), (4A), (5) (1964 ed., Supp. V); *Communist Party* v. *SACB,* 367 U. S. 1 (1961). Congressional response to the complex and intractable problems of the depression era occasionally took a similar form. Thus the Act approved in *United States* v. *Rock Royal Co-op.,* 307 U. S. 533 (1939), stated a congressional policy to restore parity prices in milk, defined the term, and delegated to the Secretary of Agriculture only the power to issue orders in terms themselves specified in the Act, commanding minimum prices to be determined in accordance with prescribed standards, to be applicable in areas where prices had fallen below the limit set by Congress. See *id.,* at 575–577.

*Second.* In other circumstances, Congress has granted to others the power to prescribe fixed rules to govern future activity and adjudications. Such delegations of power permit the legislature to declare the end sought and leave technical matters in the hands of experts,[29] or to leave to others the task of devising specific rules to carry out congressional policy in a variety of factual situations.[30] Where, as is often the case, even major policy decisions may turn on specialized knowledge and expertise beyond legislative ken, delegation of rulemaking power may be made under broad standards to a body chosen for familiarity with the subject matter to be regulated.[31] But entirely aside from whatever procedural

---

[29] *E. g., Buttfield* v. *Stranahan,* 192 U. S. 470 (1904) (congressional directive to prohibit importation of tea that is impure or unfit for consumption; standards of purity and fitness to be prescribed by administrator).

[30] *E. g., United States* v. *Grimaud,* 220 U. S. 506 (1911) (delegation of power to make regulations for use of national forests to "improve and protect" the forests).

[31] *E. g., Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969) ("fairness doctrine"); *NBC* v. *United States,* 319 U. S. 190 (1943) (regulation of network-station contracts).

protections may be afforded interested parties prior to the promulgation of administrative rules,[32] the very nature of the rulemaking process provides significant guarantees both of evenhanded treatment and of ultimate legislative supervision of fundamental policy questions. Significantly, we have upheld delegations of rulemaking power without standards to guide its exercise only in two narrowly limited classes of cases.[33] We have otherwise searched the statute, the legislative history, and the context in which the regulation was enacted in order to discern and articulate a legislative policy.[34] The point is not whether an intelligible legislative policy was or was not correctly inferred from the statute. The point is that such a policy, once expressly articulated, not only serves to guide subsequent administrative and judicial action but also provides a basis upon which the legislature may determine whether power is being exercised in ac-

[32] Most substantive exercises of federal rulemaking power are now governed by the Administrative Procedure Act, 5 U. S. C. § 551 et seq. (1964 ed., Supp. V).

[33] Ever since *Wayman* v. *Southard,* 10 Wheat. 1 (1825), we have regularly upheld congressional delegation to courts and agencies of the power to make their own rules of procedure. Cf. 5 U. S. C. § 553 (b) (3) (A) (1964 ed., Supp. V), excepting procedural rules from the requirements otherwise imposed on rulemaking procedures by the Administrative Procedure Act. Second, we have regularly upheld federal statutes that seek to further state policies by adopting or enforcing state law. *E. g., United States* v. *Howard,* 352 U. S. 212 (1957).

[34] *Fahey* v. *Mallonee,* 332 U. S. 245, 250, 253 (1947), found broad statutory standards drawing content from "accumulated experience" that "established well-defined practices." In *American Trucking Assns.* v. *United States,* 344 U. S. 298 (1953), we sustained an exercise of rulemaking power on the basis that the rules, which dealt with matters not explicitly mentioned in the statute, were reasonably necessary to prevent frustration of specific provisions of the Act. *Id.,* at 310–313.

cordance with its will.[35] Where no intelligible resolution of fundamental policy questions can be discerned from a statute or judicial decisions, the rulemaking process itself serves to make explicit the agency's resolution of these questions, thus allowing for meaningful legislative supervision,[36] as well as providing bases both for judicial review of agency action supposedly premised on the rule [37] and for refinement of an old rule in light of experience gained in its administration.

*Third.* Perhaps the most common legislative technique for dealing with complex questions that will arise in a myriad of factual contexts has been the delegation to another group of lawmaking power which may be exercised either through rulemaking or the adjudication of individual cases, with choice between the two left to the agency's judgment. Such schemes, while allowing broad flexibility for the working out of policy on a case-by-case basis, nevertheless have invariably provided substantial protections to insure against arbitrary action and to guarantee that underlying questions of policy are considered and resolved. As with the delegation simply of rulemaking power, we have often found substantial guidance in the language and history of the governing statute. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12 (1932); *Radio Commission* v. *Nelson Bros. Co.,* 289 U. S. 266 (1933); *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381 (1940). Agency action under such delegations must typically be premised upon an explanation of both the findings and reasons for a given

---

[35] Compare *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113 (1940), with 66 Stat. 308, 41 U. S. C. § 43a; compare *United States* v. *Wunderlich,* 342 U. S. 98 (1951), with 68 Stat. 81, 41 U. S. C. §§ 321, 322.

[36] See, *e. g.,* congressional revision of the Federal Trade Commission's rule regarding cigarette advertising, 29 Fed. Reg. 8325 (1964), in 79 Stat. 282 (1965).

[37] *Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954).

decision, *e. g.,* 5 U. S. C. § 557 (c)(3) (1964 ed., Supp. V), a requirement we have held to be far more than an empty formality. *SEC* v. *Chenery Corp.,* 318 U. S. 80 (1943); *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 196–197 (1941). The regular course of adjudication by a continuing body required to explain the reasoning upon which its decisions are based results in the accumulation of a body of precedent from which, over time, general principles may be deduced. See, *e. g.,* the history of the Federal Communications Commission's "fairness doctrine," traced in *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 375–379 (1969). We have often noted the importance of administrative or judicial review in providing a check on the exercise of arbitrary power, *Mulford* v. *Smith,* 307 U. S. 38, 49 (1939); *American Power & Light Co.* v. *SEC,* 329 U. S. 90, 105 (1946), and we have made clear that judicial review is designed to reinforce internal protections against arbitrary or unconsidered action while leaving questions of policy to the agency or the Congress. Thus we have withheld approval from agency action unsupported by an indication of the reasons for that action, *Phelps Dodge Corp.* v. *NLRB, supra;* where the reasons articulated were improper, *Sicurella* v. *United States,* 348 U. S. 385 (1955), even though the record might well support identical action taken for different reasons, *SEC* v. *Chenery Corp., supra;* where administrative expertise relevant to the solution of a problem had never been brought to bear upon it, *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86, 91–92 (1953); where an apparent conflict in administrative rationales had never been explained by the agency, *Barrett Line, Inc.* v. *United States,* 326 U. S. 179 (1945); and where a change in agency policy had taken place after the particular adjudication concerned, *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 615–616 (1969).

Combination of rulemaking and adjudicatory powers has proved a particularly useful tool in situations where prescription of detailed standards in the first instance has been difficult or impossible for the Congress, yet the variety of factual situations has rendered particularly important protection against random or arbitrary decisions. Thus in *Lichter* v. *United States,* 334 U. S. 742 (1948),[38] this Court dealt with the provisions of the original Renegotiation Act, passed in April 1942, which directed various administrative officials to proceed with compulsory "renegotiation" of contracts that had resulted in "excessive profits." The Act as originally passed attempted no definition of such profits; within four months, however, administrative practice had solidified about a list of six factors to be considered in determining whether profits were excessive; slightly more than two months later, these factors were adopted by Congress in an amendment to the Act. In upholding the original Act against a claim of excessive delegation, we stressed both the rapid development of generally applicable standards, *id.,* at 766, 769, 771, 773–774, 778, 783, and the availability of judicial review to check arbitrary or inconsistent administrative action. *Id.,* at 770, 771, 786–787.

## B

The next question is whether there is anything inherent in the nature of capital sentencing that makes impossible the application of any or all of the means that have been elsewhere devised to check arbitrary action. I think it is fair to say that the Court has provided no explanation for its conclusion that capital sentencing is inherently incapable of rational treatment. Instead, it relies primarily on the Report of the [British] Royal Commission

---

[38] *Lichter* has been termed by Professor Davis "in some respects the greatest delegation upheld by the Supreme Court." 1 K. Davis, Administrative Law Treatise § 2.03, at 86 (1958).

on Capital Punishment, which reaches conclusions sub-
stantially identical with the following urged in 1785 by
Archdeacon William Paley to justify England's "Bloody
Code" of more than 250 capital crimes:

> "[T]he selection of proper objects for capital
> punishment principally depends upon circumstances,
> which, however easy to perceive in each particular
> case after the crime is committed, it is impossible to
> enumerate or define beforehand; or to ascertain, how-
> ever, with that exactness, which is requisite in legal
> descriptions. Hence, although it be necessary to fix,
> by precise rules of law, the boundary on one side . . .
> yet the mitigation of punishment . . . may, without
> danger, be intrusted to the executive magistrate,
> whose discretion will operate upon those numerous,
> unforeseen, mutable and indefinite circumstances,
> both of the crime and the criminal, which constitute
> or qualify the malignity of each offence. . . . For
> if judgment of death were reserved for one or two
> species of crimes only . . . crimes might occur of
> the most dangerous example, and accompanied with
> circumstances of heinous aggravation, which did not
> fall within *any* description of offences that the laws
> had made capital, and which, consequently, could not
> receive the punishment their own malignity and the
> public safety required. . . .
>
> "The law of England is constructed upon a differ-
> ent and a better policy. By the number of statutes
> creating capital offences, it sweeps into the net every
> crime, which under any possible circumstances may
> merit the punishment of death: but, when the execu-
> tion of this sentence comes to be deliberated upon, a
> small proportion of each class are singled out, the
> general character, or the peculiar aggravations of
> whose crimes, render them fit examples of public jus-
> tice. . . . The wisdom and humanity of this design

furnish a just excuse for the multiplicity of capital offences, which the laws of England are accused of creating beyond those of other countries." W. Paley, Principles of Moral and Political Philosophy 399–401 (6th Amer. ed. 1810).

Significantly, the Court neglects to mention that the recommendations of the Royal Commission on Capital Punishment found little more favor in England than Archdeacon Paley's. For the "British have been unwilling to empower either courts or juries to decide on life or death, insisting that death should be the sentence of the law and not of the tribunal." Symposium on Capital Punishment, 7 N. Y. L. F. 249, 253 (1961) (H. Wechsler). Beyond the Royal Commission's Report, the Court supports its conclusions only by referring to the standards proposed in the Model Penal Code [39] and judging them less than perfect. The Court neglects to explain why the impossibility of perfect standards justifies making no attempt whatsoever to control lawless action. In this context the words of Mr. Justice Frankfurter are instructive:

"It is not for this Court to formulate with particularity the [standards] which would satisfy the Fourteenth Amendment. No doubt, finding a want of such standards presupposes some conception of what is necessary to meet the constitutional requirement we draw from the Fourteenth Amendment. But many a decision of this Court rests on some inarticulate major premise and is none the worse for it. A standard may be found inadequate without the necessity of explicit delineation of the standards that would be adequate, just as doggerel may be felt not to be poetry without the need of writing an essay

---

[39] And, as the Court notes, substantially adopted in one proposal of the National Commission on Reform of the Federal Criminal Laws.

on what poetry is." *Niemotko* v. *Maryland,* 340 U. S., at 285 (concurring in result).

But, although I find the Court's discussion inadequate, there remains the question whether capital sentencing is inherently incapable of being carried out under procedures that provide the safeguards necessary to protect against arbitrary determinations. I think not. I reach this conclusion for the following reasons.

*First.* It is important at the outset to recognize that two separate questions are involved. The first question is what ends any given State seeks to achieve by imposing the death penalty. The second question is whether those ends will or will not be served in any given case. The first question requires determination of the penological policy adopted by the State in choosing to kill some of its convicted criminals.[40] The second question requires that the relevant facts in any particular case be determined, and that the State's penological policy be applied to those facts.

*Second.* It is likewise important to bear in mind that the complexity of capital sentencing in any particular jurisdiction is inevitably a function of the penological policy to be applied. It is not, inherently, a difficult question. Thus, if a State should determine to kill those first-degree murderers who have been previously convicted of murder, and only those persons, the sentencing determination would ordinarily be a rather simple one.[41] On the other hand, if a State should determine to exclude only those first-degree murderers who cannot be rehabili-

---

[40] I do not mean to imply, of course, that any State has or is compelled to have a single, uniform penological policy applicable to all crimes. Presumably a State may, for example, seek to rehabilitate burglars but pursue only deterrence in sentencing parking violators.

[41] Of course, on occasion difficult problems of identity or the validity of prior convictions might arise.

tated, it is probably safe to assume that the question of proper sentencing under such a policy would be a complex one indeed. It should be borne in mind that either of these policies—or a host of others—may have been applied in the cases before us.[42]

*Third.* This is neither the time nor the place for an essay on the purposes of criminal punishment. Yet some discussion must be ventured. Without indicating any judgment as to their propriety—and without intending to suggest that no others may exist—it is apposite to note that the interests most often discussed in connection with a State's capital sentencing policy are four.[43] A State may seek to inflict retribution on a wrongdoer, inflicting punishment strictly in proportion to the offense committed. It may seek, by the infliction of punishment, to deter others from committing similar crimes. It may consider at least some wrongdoers likely to commit other crimes, and therefore seek to prevent these hypothetical future acts by removing such persons from society. It may seek to rehabilitate most offenders, reserving capital punishment only for those cases where it judges the likelihood of rehabilitation to be less than a certain amount. I may assume that many if not all States choosing to kill some convicted criminals intend thereby to further more than one of the ends listed above; and I need not doubt that some States may consider other policies as well relevant to the decision. But I can see no reason whatsoever that a State may be excused from declaring what policies it seeks to further by the infliction of capital punishment merely because it may be difficult to determine how those policies should be applied in any particular case. If anything, it would seem that the difficulty of decision in particular cases would support rather

---

[42] See Part III, *infra.*

[43] The literature is surveyed in H. Packer, The Limits of the Criminal Sanction (1968), reviewed, 79 Yale L. J. 1388 (1970).

than weaken the point that uniform decisionmaking requires that state policy be explicitly articulated. Yet the Court seems somehow to assume that jurors will be most likely to fulfill their function and correctly apply a uniform state policy if they are never told what that policy is. If this assumption finds support anywhere this side of the Looking-Glass World, I am unaware of it.

*Fourth.* This is not to say, of course, that there may be no room whatsoever for the exercise of discretion in the capital sentencing process. But discretion, to be worthy of the name, is not unchanneled judgment; it is judgment guided by reason and kept within bounds. Otherwise, in Lord Camden's words, it is "the law of tyrants: It is always unknown: It is different in different men: It is casual, and depends upon constitution, temper, passion.—In the best it is oftentimes caprice: In the worst it is every vice, folly, and passion, to which human nature is liable." *Hindson and Kersey,* cited in 8 How. St. Tr. 57 n. It may well be that any given State's notions of proper penological policy are such that the precise amount of weight to be given to any one factor in any particular case where death is a possible penalty is incapable of determination beforehand. But that is no excuse for refusing to tell the decisionmaker whether he should consider a particular factor *at all.* Particularly where decisions are made, not by a continuing body of persons, but by groups selected to make a single decision and dispersed immediately after the event, the likelihood of any consistency whatsoever is vanishingly small. "Perfection may not be demanded of law, but the capacity to counteract inevitable . . . frailties is the mark of a civilized legal mechanism." *Rosenberg* v. *United States,* 346 U. S. 273, 310 (1953) (Frankfurter, J., dissenting). The point is that even if a State's notion of wise capital sentencing policy is such that the policy cannot be implemented through a formula capable of mechanical appli-

cation—something which, incidentally, cannot be known unless and until the State makes explicit precisely what that policy is—there is no reason that it should not give some guidance to those called upon to render decision.

*Fifth.* As I have already indicated, typical legislative response to problems deemed of sufficient urgency that some solution must be implemented immediately, yet at the same time of sufficient difficulty as to be incapable of explicit statutory solution, has been to provide a means whereby the law may be usefully developed on a case-by-case basis: systems are devised whereby each case may be decided upon its facts, with consistency and the development of more general principles left to the wisdom that comes from experience. I am speaking, of course, of the administrative process, where the basis and reasons for any given decision are explained and subject to review. I see no reason that capital sentencing is *ipso facto* unsuited to such treatment. To begin with, if a legislature should deem its present knowledge insufficient to create proper standards, it is hard indeed to see why its solution should not be one that could ultimately lead to the development of such standards. Cf. *Lichter* v. *United States,* 334 U. S. 742 (1948). I see no reason that juries which have determined that a given person should be killed by the State should be unable to explain why they reached that decision, and the facts upon which it was based. Persons dubious about the ability of juries to explain their findings should consult *Fletcher* v. *Peck,* 6 Cranch 87, 95–114 (1810) (findings of trial jury). Cf. Fed. Rule Civ. Proc. 49. Even if it be assumed that juries are incapable of making such explanations, we have already held that such inability does not excuse the State from providing a sentencing process that provides reasons for the decisions reached if those reasons are otherwise required. *North Carolina* v. *Pearce,* 395 U. S. 711, 726 (1969).

In sum, I see no reason whatsoever to believe that the nature of capital sentencing is such that it cannot be surrounded with the protections ordinarily available to check arbitrary and lawless action. That it has not been is, of course, no reason to believe that it cannot be:

> "As to impossibility, all I can say is that nothing is more true of [the legal] profession than that the most eminent among them, for 100 years, have testified with complete confidence that something is impossible which, once it is introduced, is found to be very easy of administration. The history of legal procedure is the history of rejection of reasonable and civilised standards in the administration of law by most eminent judges and leading practitioners. . . . Every effort to effect improving changes is resisted on the assumption that man's ultimate wisdom is to be found in the legal system as at the date at which you try to make a change." F. Frankfurter, The Problem of Capital Punishment, in Of Law and Men 77, 86 (1956).

## III

I have explained above the reasons for my belief that the Due Process Clause of the Fourteenth Amendment compels the States to make explicit the fundamental policy choices upon which any exertion of state power is based, and to exercise such power only under procedures that both limit the possibility of merely arbitrary action and provide a record adequate to render meaningful the institution of federal judicial review. I have also explained why, in my view, there is nothing inherent in the nature of capital sentencing that makes application of such procedures impossible. There remains, then, only the question whether the two state procedures under review today provide the necessary safeguards.

A

In Ohio, if a capital defendant elects trial by jury the questions whether he is guilty of the crime charged and, if so, whether he should be killed are simultaneously submitted to the jury. Jury trial may, however, be waived as of right in capital cases, *State* v. *Smith,* 123 Ohio St. 237, 174 N. E. 768 (1931),[44] or a defendant may, with the permission of the court, enter a plea of guilty. *State* v. *Ferranto,* 112 Ohio St. 667, 148 N. E. 362 (1925). In the absence of jury trial the sentencing decision is made by a three-judge court. Ohio Rev. Code Ann. § 2945.06 (1954).

A defendant who exercises his right to jury trial may introduce only evidence relevant to the question of guilt. No evidence may "be introduced directed specifically toward a claim for mercy," *Ashbrook* v. *State,* 49 Ohio App. 298, 302, 197 N. E. 214, 216 (1935), for that "is a matter vested fully and exclusively in the discretion of the jury," *State* v. *Ellis,* 98 Ohio St. 21, 120 N. E. 218 (court's syllabus) (1918), and therefore, under Ohio law, is "not an issue in the case." *Ashbrook* v. *State, supra.* A defendant who can present no evidence on the question of guilt may not, therefore, present any evidence whatsoever to the sentencing jury.

A defendant who waives jury trial, however, is in a somewhat different situation. Presumably, of course, the same rules of evidence apply at a bench trial or at a trial upon a plea of guilty.[45] Where the sentencing

---

[44] Such waiver is apparently not a matter of right when the trial court, either from representation by defense counsel or from other information that has come to its attention, has reason to believe that the defendant is presently insane. See *State* v. *Smith, supra.*

[45] Apparently there is no such thing in Ohio as a plea of guilty to first-degree murder. Ohio Rev. Code Ann. § 2945.06 (1954) provides that if a defendant "pleads guilty of murder in the first degree, a court composed of three judges shall examine the witnesses, determine the degree of crime, and pronounce sentence accordingly."

determination is made by the court, however, two additional factors apply. First, the defendant has an absolute right to address the court before sentence is imposed, Ohio Rev. Code Ann. § 2947.05 (1954), denial of which is a ground for resentencing. *Silsby* v. *State,* 119 Ohio St. 314, 164 N. E. 232 (1928). Since the jury's decision that a defendant should be killed is unreviewable by any court, *State* v. *Klumpp,* 15 Ohio Op. 2d 461, 468, 175 N. E. 2d 767, 775–776, appeal dismissed, 171 Ohio St. 62, 167 N. E. 2d 778 (1960) (trial court); *State* v. *Reed,* 85 Ohio App. 36, 84 N. E. 2d 620 (1948), exercise of this right can have no effect on the sentencing determination in jury cases. But the trial court may modify its own sentence during the same term of court, see *Lee* v. *State,* 32 Ohio St. 113 (1877), and may therefore be swayed by the defendant's personal plea. Moreover, Ohio Rev. Code Ann. § 2947.06 (Supp. 1970) expressly permits a trial court to "hear testimony of mitigation of a sentence at the term of conviction or plea." If this statute is applicable to capital cases,[46] defendants pleading guilty or waiving jury trial may introduce additional information on the question of sentence. Again, however, the unreviewability of a jury sentence means that it can have no effect in cases tried to a jury. Finally, a death sentence imposed by a three-judge court may not be reviewed or modified on appeal. *State* v. *Ferguson,* 175 Ohio St. 390, 195 N. E. 2d 794 (1964); *State* v. *Stewart,* 176 Ohio St. 156, 198 N. E. 2d 439 (1964).

The standard instruction given capital juries on the question of punishment appears in *State* v. *Caldwell,* 135 Ohio St. 424, 425, 21 N. E. 2d 343, 344 (1939):

> "[Y]ou will determine whether or not you will extend or withhold mercy. . . . In that connection

---

[46] The statute is not limited by its terms to any particular class of cases, and the question appears never to have been discussed in the reported opinions.

whether you recommend or withhold mercy is a matter solely within your discretion, calling for the exercise of your very best and most profound judgment, not motivated by considerations of sympathy or as a means of escaping a hard or disagreeable duty, but must be considered by you in the light of all the circumstances of the case with respect to the evidence submitted to you and the other circumstances surrounding this defendant."

The jury may be instructed that "sociological matters and environment" have "nothing whatever to do with [the] case," *id.*, at 428, 21 N. E. 2d, at 344, but it appears that this instruction is not generally given. Likewise, the trial court may, but is not compelled to, inform the jury about matters such as parole from a sentence to life imprisonment. *State* v. *Meyer,* 163 Ohio St. 279, 126 N. E. 2d 585 (1955); *State* v. *Henley,* 15 Ohio St. 2d 86, 238 N. E. 2d 773 (1968). In petitioner Crampton's case, the jury was instructed generally that it should not be "influenced by any consideration of sympathy or prejudice." On the question of punishment, it was told only that "[i]f you find the defendant guilty of murder in the first degree, the punishment is death, unless you recommend mercy, in which event the punishment is imprisonment in the penitentiary during life." The jury was also handed a verdict form with a "line which you must fill in. We—blank—recommend mercy and you will put in that line, we do, or, we do not, according to your finding." Except for a supplementary instruction informing the jury that its recommendation had to be unanimous, no further instructions on the question of punishment were given the jury.

There is in my view no way that this Ohio capital sentencing procedure can be thought to pass muster under the Due Process Clause.

*First.* Nothing whatsoever in the process either sets forth the basic policy considerations that Ohio believes relevant to capital sentencing, or leads towards elucidation of these considerations in the light of accumulated experience. The standard jury instruction contains at best an obscure hint.[47] The instructions given in the present case contain none whatsoever. So far as they are concerned, the jury could have decided to impose the death penalty as a matter of simple vengeance for what it considered an atrocious crime; because it felt that imposition of the death penalty would deter other potential murderers; or because it felt that petitioner, if not himself killed, might kill or commit some other wrong in the future. The jury may have been influenced by any, all, or none of these considerations. If it is beyond the present ability of the Ohio Legislature to "identify before the fact those characteristics of criminal homicides and their perpetrators which"—*in the judgment of the State of Ohio*—"call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority," *ante,* at 204, the Ohio procedure is hardly designed to improve that ability. It contains no element of the proudest tradition of the common law—the ability to grow with time by slowly deriving principles of general applicability from careful consideration of the myriad facts of a multitude of particular cases. Neither we nor the State of Ohio can know the reasoning by which this jury determined to impose the death penalty, or the facts upon which that reasoning was based. All we know is that the jury did not appear to find the question a particularly difficult one. For the jury determined that James Edward Crampton had murdered his wife, that he had done so while legally sane, and that he should be killed—in less than five hours.

---

[47] See *infra,* at 292–293.

*Second.* The policies applied by the State of Ohio to determine that James Edward Crampton should die were neither articulated to nor explained by the jury that made that decision. Nor have they been elsewhere set forth. The standard jury instructions, quoted *supra,* at 289–290, do tell the jury to reach its determination "in the light of all the circumstances of the case with respect to the evidence submitted to you and the other circumstances surrounding this defendant." A perceptive jury might conclude that this instruction indicates that Ohio considers the relative severity of the crime a factor of substantial importance in the determination of sentence. How the jury is to determine the severity of the crime before it in relation to others is, however, something of a mystery, since Ohio law simultaneously demands that the sentencing determination be based strictly upon the evidence adduced in the case at hand, *Howell* v. *State,* 102 Ohio St. 411, 131 N. E. 706 (1921), and forbids the defendant to introduce evidence of other crimes or other judgments to aid the jury in determining whether the murder he has committed is more or less severe than other murders. *Ashbrook* v. *State, supra.* Similarly, by directing the jury's attention to "the other circumstances surrounding this defendant" it might be thought that Ohio was suggesting consideration of environmental factors that might make the defendant's actions, if no more justifiable, less a reflection of personal blameworthiness. Yet any such reading of the instruction is condemned by *State* v. *Caldwell, supra,* which approved a jury charge that environmental factors have "nothing whatever to do" with the sentencing decision. It also might be thought that directing juries to consider "other circumstances surrounding this defendant" is an indication, albeit a rather backhanded one, that Ohio desires capital sentencing juries to take into account the likelihood that a particular de-

fendant may be rehabilitated. Certainly this indication is reinforced in cases where the jury is instructed with regard to the possibility of parole from a life sentence. But instructions on parole are optional with the trial court, *State* v. *Henley, supra; State* v. *Meyer, supra,* and unless it be assumed that every jury not so instructed is nevertheless aware of the possibility of parole (and likewise that, despite instructions to base its verdict on the evidence in the case, it will nevertheless rely upon its own knowledge of the possibility of parole), failure to instruct all juries with regard to parole must mean either that a state policy with regard to rehabilitation is not in fact implied by such instructions, or else that such a state policy is consciously applied only in some capital cases. Finally, one Ohio case may be explicable only on a basis suggested nowhere else in Ohio law: that the capital sentencing decision rests upon factors that vary depending upon which of two simultaneously applicable capital statutes is used to support punishment. In *State* v. *Ferguson,* 175 Ohio St. 390, 195 N. E. 2d 794 (1964), the defendant had been convicted on guilty pleas entered to charges of premeditated murder and felony murder, both growing out of the murder, during the course of a robbery, of a single individual. The three-judge court that heard evidence to fix the penalty on both charges at the same time sentenced him to life imprisonment on the premeditated murder charge, and to death on the charge of felony murder. The Ohio Supreme Court affirmed the sentence of death. In light of these cases, I think it fair to say that Ohio law has nowhere purported to set forth the considerations of state policy intended to underlie a sentence of death.

*Third.* Even if it be assumed that Ohio sentencing judges and juries act upon shared, although unarticulated and unarticulable, notions of proper capital sentencing

policy, the capital sentencing process in Ohio contains elements that render difficult if not impossible any consistency in result. Presumably all judges, and certainly some juries (*i. e.,* those who are specifically so instructed) will be cognizant of the possibility of parole from a sentence to life imprisonment. Other juries will not. If this is an irrelevant factor, it is hard to understand why some juries may be given this information. If it is a relevant factor, it is equally hard to understand why other juries are not. And if it *is* a relevant factor, the inevitable consequence of presenting the information, for no explicable reason, to some but not all capital sentencing juries, is that consistency in decisionmaking is impossible. Similarly, as I have already noted,[48] there is a substantial difference between the evidence that may be considered by a jury and that which may be considered by a sentencing panel of judges. For although the defendant may, in a jury trial, testify on the question of guilt if he is willing to forgo his privilege against self-incrimination, he may not even then present evidence relevant solely to the question of penalty. A defendant who is to be sentenced by a panel of judges, on the other hand, has an absolute right before the sentencing decision becomes final to address the sentencers on any subject he may choose.[49] And such a defendant appears as well to have at least a chance to present evidence from other sources relevant solely to the sentencing determination before that determination becomes final.[50] Yet such information may not be presented to a jury, whether the jury desires it or not. The point, again, is that consistent decisionmaking is impossible when one decisionmaker may consider information forbidden to another.

[48] See *supra,* at 288–289.

[49] See Ohio Rev. Code § 2947.05 (1954); *supra,* at 288–289.

[50] See Ohio Rev. Code § 2947.06 (Supp. 1970); *supra,* at 289.

And where, as here, no basis whatsoever is presented to justify the difference, it is inexcusable.[51]

*Fourth.* There is, moreover, no reason to believe that Ohio capital sentencing judges and juries do in fact share common notions of the considerations relevant to capital sentencing. I have already pointed out that no state policy has ever been articulated. And whatever may be the case with judges, capital sentencing juries are drawn essentially at random [52] and called upon to decide one case and one case only.[53] Whatever value there may be in the notion that arbitrary decisionmaking may be controlled by committing difficult questions to a continuing body which can at least maintain consistency of principle until it changes its views on the questions to be decided, is entirely absent from the capital jury sentencing process

---

[51] In addition, the evidence before the sentencing authority—and therefore the possible bases for its decision—will vary substantially with a number of factors, such as the presence or absence of an insanity defense, the willingness *vel non* of a defendant to waive the privilege against self-incrimination, and so forth. In this context the irrational nature of a unitary trial is particularly conspicuous. A jury that considered recidivism relevant to its sentencing determination could obtain information with respect to that point only if the defendant should testify, or if evidence of other crimes should be relevant (for reasons such as motive, identity, and so forth) to the question of guilt.

[52] Ohio does exclude jurors with conscientious scruples against capital punishment, *State* v. *Carter*, 21 Ohio St. 2d 212, 256 N. E. 2d 714 (1970).

[53] Of course, codefendants may be tried by the same jury, and some jurors may at some time have sat on another capital case. Nothing suggests, however, that the latter class of jurors is anything but an insubstantial one. In light of the fact that first-degree murder convictions in the period 1959–1968 never exceeded 58 per year, evidence that a significant number of jurors were involved in more than one capital sentencing determination would seem to raise substantial questions about the randomness of the jury selection procedures.

presently under review. For capital sentencing juries in Ohio are *not* continuing bodies, and no jury may be told what another jury has done in similar (or different) cases. Likewise, the procedure under review cannot gain uniformity from judicial review, for under Ohio law no such review is permitted.

*Fifth.* Although the Due Process Clause does not forbid a State from imposing "a different punishment for the same offence . . . under particular circumstances," *Moore* v. *Missouri,* 159 U. S. 673, 678 (1895), it does command that punishment be "dealt out to all alike who are similarly situated." *Ibid.; Leeper* v. *Texas,* 139 U. S. 462, 468 (1891); *Missouri* v. *Lewis,* 101 U. S. 22, 31 (1880). Even granting the State the fullest conceivable room for judgment as to what are and are not "particular circumstances" justifying different treatment, this means at the least that the State must itself apply the same fundamental policies to all in making that judgment. The institution of federal judicial review is designed to vindicate this (and other[54]) federally guaranteed rights. Yet the procedure before us renders the possibility of such review entirely chimerical. There is no way of determining what policies were applied by the State in reaching judgment. There is no way of inferring what policies were applied by an examination of the facts, for we have no idea what facts were relied on by the sentencers. Nor may this void be filled in any way by presumptions based on the result of their actions, for they were neither given direction in the exercise of judgment nor asked to explain the conclusion they reached. There

---

[54] No matter how broad the scope of state power to determine when the death penalty should be inflicted, it cannot be seriously questioned that its infliction for *some* reasons is constitutionally impermissible. Yet nothing in the Ohio procedure before us prevents a jury from relying upon impermissible reasons, or allows anyone to determine whether this is what the jury has done.

is simply no way that this or any other court can determine whether petitioner Crampton was condemned to die for reasons that Ohio would be willing to apply in any other case—or for reasons that Ohio would, if they were explicitly set forth, just as explicitly reject.

In sum, the Ohio capital sentencing procedure presently before us raises fundamental questions of state policy which have never been explicitly decided by any responsible organ of the State. Nothing in the procedure looks towards the gradual development of a uniform state policy through accumulation of a body of precedent. No protection whatsoever appears against the possibility of merely arbitrary or willful decisionmaking; moreover, some features of the process appear to make inconsistent action not merely possible but inevitable. And finally, the record provided by the Ohio capital sentencing process makes virtually impossible the redress of any violations of federally guaranteed rights through the institution of federal judicial review. I can see no possible basis for holding such a capital sentencing procedure permissible under the Due Process Clause, and I would therefore reverse petitioner Crampton's sentence of death.

## B

The procedures whereby the State of California determines which convicted criminals to kill differ in a number of respects from those used by Ohio. Following conviction of a possibly capital crime,[55] the question of penalty

---

[55] Cal. Penal Code § 4500 (1970) defines the mandatory capital crime of assault with malice aforethought with means likely to cause great bodily injury by a prisoner under sentence of life imprisonment, where the person assaulted is not a fellow inmate, and dies within a year and a day. Amici N. A. A. C. P. Legal Defense and Educational Fund, Inc., and National Office for the Rights of the Indigent, represent without contradiction elsewhere that this is the only mandatory capital statute presently in active use in the United States. See Brief amici curiae 15 n. 19.

is determined in a separate proceeding.[56]   Except where the defendant has, with the prosecution's consent,[57] waived trial by jury, the sentencing determination is made by a jury whether conviction was on a plea of guilty or not guilty.   A defendant who waives jury trial on the issue of guilt may not have his sentence determined by a jury.   *People* v. *Golston,* 58 Cal. 2d 535, 375 P. 2d 51 (1962).   Notwithstanding the statutory language,[58] it appears possible for a defendant whose guilt is de-

---

[56] Cal. Penal Code § 190.1 (1970) provides, in pertinent part:

"If [a] person has been found guilty of an offense punishable by life imprisonment or death, and has been found sane on any plea of not guilty by reason of insanity, there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty.   Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty.   The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented, and the penalty fixed shall be expressly stated in the decision or verdict. . . .

"If the defendant was convicted by the court sitting without a jury, the trier of fact shall be the court.   If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived.   If the defendant was convicted by a jury, the trier of fact shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty.

"In any case in which defendant has been found guilty by a jury, and the same or another jury, trying the issue of penalty, is unable to reach a unanimous verdict on the issue of penalty, the court shall dismiss the jury and either impose the punishment for life in lieu of ordering a new trial on the issue of penalty, or order a new jury impaneled to try the issue of penalty, but the issue of guilt shall not be retried by such jury."

[57] See Cal. Const., Art. I, § 7; *People* v. *King,* 1 Cal. 3d 791, 463 P. 2d 753 (1970).

[58] See n. 56, *supra.*

termined by a jury to have his sentence determined by a judge. See *People* v. *Sosa,* 251 Cal. App. 2d 9, 58 Cal. Rptr. 912 (1967). If a jury is waived, identical sentencing power will be exercised by a single judge. *People* v. *Langdon,* 52 Cal. 2d 425, 341 P. 2d 303 (1959); *People* v. *Jones,* 52 Cal. 2d 636, 343 P. 2d 577 (1959). A jury determination to impose a death sentence may be set aside by the judge presiding at the trial, Cal. Penal Code § 1181 (7) (1970), construed in *People* v. *Hill,* 66 Cal. 2d 536, 426 P. 2d 908 (1967). It may not be , otherwise reviewed, whether fixed by a judge or jury. *People* v. *Welch,* 58 Cal. 2d 271, 373 P. 2d 427 (1962) (judge); *In re Anderson,* 69 Cal. 2d 613, 447 P. 2d 117 (1968).[59]

The range of evidence that may be introduced at the penalty trial is broad. Ordinary rules of competence, hearsay, etc., apply, *e. g., People* v. *Hines,* 61 Cal. 2d 164, 174–175, 390 P. 2d 398, 405 (1964), and a few issues are excluded. Exclusion, however, appears to be not on the basis that the issues are irrelevant, but rather that they are either unduly inflammatory or impractical to litigate. Thus, evidence or argument is prohibited concerning the likelihood of parole from a life sentence, *People* v. *Morse,* 60 Cal. 2d 631, 388 P. 2d 33 (1964); [60] concerning the deterrent effects of capital punishment, *People* v. *Purvis,* 60 Cal. 2d 323, 341, 384 P. 2d 424, 435–436 (1963); *People* v. *Love,* 56 Cal. 2d 720, 366 P. 2d 33 (1961); *People* v. *Kidd,* 56 Cal. 2d 759, 366 P. 2d

---

[59] The proceedings leading to that determination are, as indicated in the text immediately following, reviewable.

[60] *Morse* noted that "[w]hen we opened the door a slight crack to allow an instruction, and to admit an evidentiary showing, as to the realistic consequence of a sentence of life imprisonment, we had in mind a limited and legitimate objective. But various maneuvers have pushed the door so widely ajar that too many confusing elements have entered the courtroom." 60 Cal. 2d, at 639, 388 P. 2d, at 38.

49 (1961),[61] although some reference to the matter may (as in the present case, see App. 199) be made by the prosecution and be treated under the harmless-error doctrine, *People* v. *Garner,* 57 Cal. 2d 135, 367 P. 2d 680 (1961), especially if trial is to the court, *People* v. *Welch,* 58 Cal. 2d 271, 274, 373 P. 2d 427, 429 (1962); concerning whether capital punishment should ever be imposed, *People* v. *Moya,* 53 Cal. 2d 819, 350 P. 2d 112 (1960); [62] or concerning physical suffering of the victim unintended by the defendant, *People* v. *Love,* 53 Cal. 2d 843, 350 P. 2d 705 (1960).[63] Except for these limitations, however, virtually any matter may be explored. *People* v. *Terry,* 61 Cal. 2d 137, 142–153, 390 P. 2d 381, 385–392 (1964).

Following the arguments of counsel,[64] the jury is instructed on its function in determining the penalty to be imposed. A standard instruction on the subject exists [65]

---

[61] *Kidd* held that a defendant could not submit evidence that capital punishment was an ineffective deterrent because "[i]nnumerable witnesses could be produced to testify on both sides of the question" and because, quoting *Love,* "[j]uries in capital cases cannot become legislatures *ad hoc.*" 56 Cal. 2d, at 770, 366 P. 2d, at 56. *Love* held argument of counsel impermissible because evidence on the question was impermissible. 56 Cal. 2d, at 731, 366 P. 2d, at 39.

[62] The basis for this ruling is that the issue has been foreclosed by the statute allowing capital punishment to be imposed.

[63] This rule is based, apparently, upon the notion that such evidence would be unduly inflammatory. See *People* v. *Floyd,* 1 Cal. 3d 694, 464 P. 2d 64 (1970).

[64] *People* v. *Bandhauer,* 66 Cal. 2d 524, 426 P. 2d 900 (1967), struck down prospectively the earlier practice of allowing the prosecution to open and close the arguments as inconsistent with the legislature's "strict neutrality" concerning the choice of life or death. *Id.,* at 531, 426 P. 2d, at 905.

[65] California Jury Instructions, Criminal, ¶ 8.80 (3d rev. ed., 1970).

but is not mandatory; it is, essentially, the instruction given in the present case:

"The defendants in this case have been found guilty of the offense of murder in the first degree, and it is now your duty to determine which of the penalties provided by law should be imposed on each defendant for that offense. Now, in arriving at this determination you should consider all of the evidence received here in court presented by the People and defendants throughout the trial before this jury. You may also consider all of the evidence of the circumstances surrounding the crime, of each defendant's background and history, and of the facts in aggravation or mitigation of the penalty which have been received here in court. However, it is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other hand.

.        .        .        .        .

"It is the law of this state that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury. If you should fix the penalty as confinement for life, you will so indicate in your verdict. If you should fix the penalty as death, you will so indicate in your verdict. Notwithstanding facts, if any, proved in mitigation or aggravation, in determining which punishment shall be inflicted, you are entirely free to act according to your own judgment, conscience, and absolute discretion. That verdict must express the individual opinion of each juror.

"Now, beyond prescribing the two alternative penalties, the law itself provides no standard for the

guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience, and absolute discretion of the jury. In the determination of that matter, if the jury does agree, it must be unanimous as to which of the two penalties is imposed." [66]

Substantially more elaborate versions of this instruction may, if the trial court desires, be given. *People* v. *Harrison,* 59 Cal. 2d 622, 381 P. 2d 665 (1963). In addition, the trial court is supposed to instruct the jury that a defendant serving a life sentence may be paroled, but that it should not presume that the California Adult Authority will release a prisoner until it is safe to do so, and that it should not take the possibility of parole into account. *People* v. *McGautha,* 70 Cal. 2d 770, 452 P. 2d 650 (1969). Finally, under California law it is error to charge that the jury's verdict should express the conscience of the community; the jury should be told, instead, that the verdict must "express the individual conscience of each juror." *People* v. *Harrison, supra,* at 633, 381 P. 2d, at 671.[67]

---

[66] The elided paragraph, not included in the standard instruction referred to, instructed the jury that it could not consider evidence of other crimes against a defendant unless the other crimes were proved beyond a reasonable doubt. The jury below was also instructed that "the law does not forbid you from being influenced by pity for the defendants and you may be governed by mere sentiment and sympathy for the defendants." App. 221–222.

[67] The jury was so instructed in the present case; see *supra,* at 301–302. In light of this it is mystifying to find the Court relying, *ante,* at 201–202, on the following quotation from *Witherspoon* v. *Illinois,* 391 U. S. 510, 519 (1968), to sustain the California procedure: "[capital sentencing juries] do little more—*and must do nothing less*—than express the conscience of the community on the ultimate question of life or death." (Emphasis added; footnote omitted.)

A substantial number of subsidiary instructions may but need not be given to the jury; the governing principle is that the instructions must make clear to the jury that its decision whether or not a convicted defendant is to be killed is to take place in a "legal vacuum." *People v. Terry,* 61 Cal. 2d, at 154, 390 P. 2d, at 392; see *People v. Friend,* 47 Cal. 2d 749, 306 P. 2d 463 (1957). A trial judge may, should he desire, "aid the jury by stating the kinds of factors that may be considered, thereby setting the tone for the jury's deliberation," *People v. Polk,* 63 Cal. 2d 443, 451, 406 P. 2d 641, 646 (1965), so long as this is done in a manner that indicates to the jury that it is free not to consider any of the factors listed by the judge, and to consider anything else it may desire, *People v. Friend, supra.* It is not, however, error to refuse such an instruction. *People v. Polk, supra.* Similarly, although a trial judge may instruct the jury that it may be moved by sympathy for the defendant, *People v. Anderson,* 64 Cal. 2d 633, 414 P. 2d 366 (1966), he may refuse to give such an instruction at defense request, *People v. Hillery,* 65 Cal. 2d 795, 423 P. 2d 208 (1967), although it is error to instruct the jury that it may *not* be so moved. *People v. Polk, supra; People v. Bandhauer,* 1 Cal. 3d 609, 463 P. 2d 408 (1970). It is error to instruct the jury that it may *not* consider doubts about the defendant's guilt as mitigating circumstances, *People v. Terry, supra,* but it is not error to refuse to charge that such doubt *may* be a mitigating factor, *People v. Washington,* 71 Cal. 2d 1061, 458 P. 2d 479 (1969), although the trial judge may give such a charge if he desires, *People v. Polk, supra; People v. Terry, supra.*

Finally, a jury determination to impose the death sentence may not be reviewed by any court. It may, however, be set aside by the judge presiding at the trial. The

basis upon which the California Supreme Court has made this distinction, of some importance in the present case, is not entirely clear. The trial judge's power to reduce a sentence of death to one of life imprisonment is based on Cal. Penal Code § 1181 (7) (1970), which provides, in pertinent part, that "in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed." The California Supreme Court has construed this statute to empower the trial court to set aside a jury verdict of death, *People* v. *Moore*, 53 Cal. 2d 451, 454, 348 P. 2d 584, 586 (1960), but *not* to give any such power to an appellate court, *People* v. *Green*, 47 Cal. 2d 209, 235, 302 P. 2d 307, 324–325 (1956); *In re Anderson*, 69 Cal. 2d 613, 447 P. 2d 117 (1968). This is said to be because "the trier of fact is vested with exclusive discretion to determine punishment." *People* v. *Green, supra*, at 235, 302 P. 2d, at 325. What this means is that the trial court does not *review* the jury's determination that a convicted defendant should be killed; based upon its "own independent view of the evidence," *People* v. *Love*, 56 Cal. 2d, at 728, 366 P. 2d 33, 36, quoting *People* v. *Moore, supra*, at 454, 348 P. 2d, at 586 (1960), the trial court is to determine itself whether the defendant should be killed, apparently on exactly the same basis and in exactly the same way as it would if the issue had never been submitted to a jury.[68] See *People* v. *Moore, supra; People* v. *Hill*, 66 Cal. 2d 536, 426 P. 2d 908 (1967); *People* v. *Love, supra; In re Anderson, supra.*

---

[68] That is, the court is to exercise the same unlimited power given to the jury.

In short, no defendant sentenced to die may obtain judicial review of that decision, but one sentenced to die by a jury gets a second bite at the apple: he is "entitled to two decisions on the evidence." *People* v. *Ketchel,* 59 Cal. 2d 503, 546, 381 P. 2d 394, 417 (1963).

I find this procedure likewise defective under the Due Process Clause. Although it differs in some not insignificant respects from the procedure used in Ohio, it nevertheless is entirely bare of the fundamental safeguards required by due process.

*First.* Both procedures contain at their heart the same basic vice. Like Ohio, California fails to provide any means whereby the fundamental questions of state policy with regard to capital sentencing may be authoritatively resolved. They have not been resolved by the state legislature, which has committed the matter entirely to whatever judge or jury may exercise sentencing authority in any particular case. But they cannot be authoritatively resolved by the sentencing authority, not only because the California Supreme Court has expressly ruled that that is not part of the sentencing function, *People* v. *Kidd,* 56 Cal. 2d, at 770, 366 P., at 56, but also because any such resolution is binding for one case and one case only. There are simply no means to assure that "truly fundamental issues [will ultimately] be resolved by the Legislature," *Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control,* 65 Cal. 2d 349, 369, 420 P. 2d 735, 748 (1966). Nothing whatsoever anywhere in the process gives any assurance that one defendant will be sentenced upon notions of California penological policy even vaguely resembling those applied to the next.

*Second.* If the question before us were what procedure would produce the fewest number of death sentences, the power of a trial judge to set aside a jury's verdict might be of substantial importance. But that, of course, is not

the question. Except insofar as it incorporates the Eighth Amendment's prohibition against cruel and unusual punishments—not an issue in these cases—the Due Process Clause gives us no warrant to interfere with a State's decision to make certain crimes punishable by death. The Due Process Clause commands us, however, to make certain that no State takes one man's life for reasons that it would not apply to another. And even if it be assumed that trial judges obey the California Supreme Court's direction to exercise their own, independent judgment on the propriety of a jury-imposed death penalty,[69] the existence of the trial court's power to set aside such verdicts adds little to the likelihood of evenhanded treatment. For this power is to be exercised in precisely the same way as the jury's—without guideline or check, without review, without any explanation of reasons or findings of fact, without any opportunity for ultimate legislative acceptance or rejection of the policies applied. It is true that trial judges are in a sense "professional sentencers"; presumably any given judge, to the extent that he actually does exercise independent judgment on the question,[70] will do his best to avoid conscious inconsistency. But there remains a multiplicity of sentencing judges, all of whom have been expressly told by the Supreme Court of California not to seek guidance for their decision from the statute, from that court's opinions, or indeed from any source outside their own, individual opinions. See *supra*, at 304–305.

[69] Apparently the trial judge did not do so in this case: denying petitioner McGautha's motion for reduction of penalty, he said: "[C]ertainly this Court, I do not think, except in most unusual circumstances, is justified in placing the Court's judgment over and above that of the 12 people who have carefully deliberated upon this case and decided that the proper penalty in this case should not be life imprisonment." App. 243.

[70] See n. 69, *supra*.

In such circumstances, the possibility of consistent decisionmaking is nonexistent. "A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." *Garner* v. *Teamsters Local 776,* 346 U. S. 485, 490–491 (1953).

*Third.* Like its Ohio counterpart, the California procedure before us inevitably operates to frustrate the institution of federal judicial review. We do not and cannot know what facts the jury relied upon in determining that petitioner McGautha should be killed, or the reasons upon which it based that decision. We do not know—and cannot know—the basis upon which the State of California determined that he was not "fit to live," *People* v. *Morse,* 60 Cal. 2d, at 647, 388 P. 2d, at 43. We do know that the prosecutor, in her closing argument, strongly urged to the jury that Dennis Councle McGautha should be killed because he had the unregenerate bad taste to insist that he had once pleaded guilty to a crime he did not commit.[71] Cf. *North Carolina* v. *Alford,* 400 U. S., at 32–39. We also know

---

[71] "[McGautha] has three robberies. He has over ten years in prison, and he has another killing, and you will have all those documents in front of you in the jury room about his prior record, and the thing about his prior record is the way in which he minimizes his involvement. Can you imagine that the first prior I think we had on him was a robbery, and he has the nerve to sit up there on the witness stand and tell people who he is asking not to kill him—he has the nerve to tell those people, 'I pleaded guilty to robbery, but I didn't really do that robbery,' and then he tells them about the second robbery. The friends whom he was giving a ride were involved in that second robbery. He didn't commit that robbery, but he pleaded guilty to it. He got sentenced to 10 years and he served six years.

"What kind of person do we have here who, having spent all that time in prison, still is unwilling to acknowledge his participation in crime?" App. 204–205.

that nothing in the instructions given the jury contained the slightest hint that this could not be the sole basis for its decision. See *supra,* at 301–302. And, finally, we also know that whatever factors the State of California relied upon to sentence petitioner McGautha to death—factors permissible or impermissible, applied by the State to every convicted capital criminal or to him alone—there is no way whatsoever that petitioner can demonstrate that those factors were relied upon and obtain review of their propriety. In short, the procedure before us in this case simultaneously invites sentencers to flout the Constitution of the United States and promises them that, should they do so, their action is immune from federal judicial review.[72] Astoundingly, the Court in upholding the procedure explicitly commends this very feature. See *ante,* at 207–208.[73]  I do not think that such a proce-

---

[72] A peculiarity of California law raises another, more subtle, point. Juries, as noted, are not required to base their decision on any particular findings of fact. But if a given jury should determine to impose the death sentence *only* if it found particular facts that it thought relevant, it still would not be required to find those facts by even a preponderance of the evidence. *People* v. *Hines,* 61 Cal. 2d 164, 173, 390 P. 2d 398, 404 (1964). I do not suggest that due process requires such facts to be found beyond a reasonable doubt, or that we could reverse on due process grounds a conviction or sentence that we believed contrary to the weight of the evidence. But there is in my mind a serious question whether a State may constitutionally allow *its chosen trier of fact* to base a determination to kill any person on facts that the *trier of fact himself* does not believe are supported by the weight of the evidence. Cf. *In re Winship,* 397 U. S. 358, 370, 371–373 (1970) (HARLAN, J., concurring) (standard of proof required by due process depends upon the "consequences of an erroneous factual determination").

[73] The Court, to be sure, refers only to jury consideration of arguments suggested by "defense counsel." I do not, however, understand the Court to imply that the arguments of counsel for the State are given any less consideration.

dure is consistent with the Due Process Clause, and I would accordingly reverse petitioner McGautha's sentence of death.

## C

I have indicated above the reasons why, in my judgment, the procedures adopted by Ohio and California to sentence convicted defendants to die are inconsistent with the most basic and fundamental principles of due process. But even if I thought these procedures adequate to try a welfare claim—which they are not, *Goldberg* v. *Kelly,* 397 U. S. 254 (1970)—I would have little hesitation in finding them inadequate where life itself is at stake. For we have long recognized that the degree of procedural regularity required by the Due Process Clause increases with the importance of the interests at stake. See *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895-896 (1961); *id.,* at 900-901 (dissent). Where First Amendment interests have been involved we have held the States to stringent procedural requirements indeed. See, *e. g., Stanley* v. *Georgia,* 394 U. S. 557 (1969); *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *A Quantity of Books* v. *Kansas,* 378 U. S. 205 (1964); *Marcus* v. *Search Warrant,* 367 U. S. 717 (1961); *Speiser* v. *Randall,* 357 U. S. 513 (1958). Of course the First Amendment is "an interest of transcending value," *id.,* at 525, but so is life itself. Yet the Court's opinion turns the law on its head to conclude, apparently, that *because* a decision to take someone's life is of such tremendous import, those who make such decisions need not be "inhibit[ed]" by the safeguards otherwise required by due process of law. *Ante,* at 208. My belief is to the contrary, and I would hold that no State which determines to take a human life is thereby exempted from the constitutional command that it do so only by "due process of law."

## IV

Finally, a few words should be said about matters peripherally suggested by these cases. First, these cases do not in the slightest way draw into question the power of the States to determine whether or not to impose the death penalty itself, any more than *Giaccio v. Pennsylvania,* 382 U. S. 399 (1966), involved the power of the State of Pennsylvania to impose criminal punishment on persons who should fire a pistol loaded with blanks at another. Second, these cases do not call upon us to determine whether petitioners' trials were "fairly conducted" in the way referred to by my Brother BLACK. *Ante,* at 225. What they do call upon us to determine is whether the Due Process Clause requires the States, in his words, "to make certain that men would be governed by *law,* not the arbitrary fiat of the man or men in power," *In re Winship,* 397 U. S. 358, 384 (1970) (dissent), and whether if a State, acting through its jury, applies one standard to determine that one convicted criminal should die, "the Due Process Clause commands that every trial in that jurisdiction must adhere to that standard." *Id.,* at 386. Third, we are not called upon to determine whether "the death penalty is appropriate punishment" for the petitioners before us. *Ante,* at 221. That determination is for the States.[74] The Court, however, apparently believes that the procedures before us are to be upheld because the results in the present cases comport with its own, unarticulated notions of capital sentencing policy. See *ibid.* This fundamental misapprehension of the judicial function pervades the Court's opinion, which after a single brief mention of the Due Process Clause entirely eschews dis-

---

[74] Except, of course, insofar as state power may be restricted by the Eighth Amendment, a question not involved in these cases.

cussion of the Constitution, and instead speaks only of the considerations upon which it believes the States should rest their capital sentencing policy. *Ante,* at 196–208.

Finally, I should add that for several reasons the present cases do not draw into question the power of the States that should so desire to commit their criminal sentencing powers to a jury. For one thing, I see no reason to believe that juries are not capable of explaining, in simple but possibly perceptive terms, what facts they have found and what reasons they have considered sufficient to take a human life. Second, I have already indicated why I believe that life itself is an interest of such transcendent importance that a decision to take a life may require procedural regularity far beyond a decision simply to set a sentence at one or another term of years. Third, where jury sentencing involves such a decision, determination of the ultimate question—how many years a defendant will actually serve—is generally placed very substantially in the hands of a parole board—a single, continuing board of professionals whose general supervision and accumulated wisdom can go far toward insuring consistency in sentencing. And finally, in most cases where juries are asked to fix a convicted defendant's sentence at one or another term of years, they must inevitably be aware that, no matter what they do, the defendant will eventually return to society. With this in mind, a jury should at the very least recognize that rehabilitation must be a factor of substantial weight in its deliberations. Of course, none of these cases are before us, and I do not mean to imply that any and every question other than the question of life or death may be submitted by a State to a jury to be determined in its unguided, unreviewed, and unreviewable discretion. But I cannot help concluding that the Court's opinion, at its

core, rests upon nothing more solid than its inability to imagine any regime of capital sentencing other than that which presently exists. I cannot assent to such a basis for decision. "If we would guide by the light of reason, we must let our minds be bold." *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting).